2 U.S. 304 (____)
2 Dall. 304
VANHORNE'S Lessee
versus
DORRANCE.
Supreme Court of United States.

Present, PATTERSON and PETERS, Justices.
PATTERSON, Justice.
Having arrived at the last stage of this long and interesting cause, it now becomes the duty of the Court to sum up the evidence, and to declare the law arising upon it. A mass of testimony has been brought forward in the course of the trial, the far greater part of which is altogether immaterial, and can be of no use in forming a decision. The great points, on which the cause turns, are of a legal nature; they are questions of law; and, therefore, for the sake of the parties, as well as for my own sake, they ought to be put in a train for ultimate adjudication by the Supreme Court. In the administration of justice it is a consolatory idea, that no opinion of a single judge can be final and decisive; but that the same may be removed before the highest tribunal for revision, where, if erroneous, it will be rectified. For the sake of clearness, I shall consider,
1st. The title of the plaintiff.
2d. The title of the defendant.

1. The Title of the Plaintiff.
In deducing the title, the plaintiff exhibited:
1. The charter or grant from Ch. 2. to William Penn. The lands in question lie within the limits of this charter.
2.[*]A Deed from the Six Nations to Thomas and Richard Penn. To this deed a map is annexed and made part of it, by which the land conveyed is accurately delineated, or laid down. This mode of procedure is eminently just and laudable; it furnishes a precedent, which, as far as possible, ought to be observed in *305 every transfer of land made by the Indians, as it obviously tends to quiet the spirit of jealousy, to remove suspicion, and prevent imposition and fraud.
3.[*]A warrant to survey for the proprietors, certain tracts of land containing twenty thousand acres.
4.[]Survey of the above lands. The land in controversy lies within the Indian deed to the Penns, and is covered by this survey.
5.[]Lease from Thomas & Richard Penn to Thomas Van Horne, for the term of seven years, of lot No. 38, containing one hundred acres.
6. Instructions to lay out and sell the land.
7.[§] Allotment to Thomas Van Horne of lot No. 20, containing 190 acres and 90 perches.
8.[]Warrant from Richard Penn, lieutenant governor, to make a separate return of lot No. 20, to Thomas Van Horne. A separate return was made accordingly, and marked on the general survey of March 1771.
9.[**]Patent from Thomas and John Penn to Thomas Van Horne for lot No. 20. The consideration money was paid agreeably to contract.
10.[]Deed from Thomas Van Horne to Cornelius Van Horne, lessor of the plaintiff, for lot No. 20.
It is in evidence, that this lot was built upon, fenced, tilled, and improved by Van Horne. It is also in evidence, that John Dorance, the defendant, is in possession of, and resides upon, the said lot.
Such is the title upon which the plaintiff rests his cause. It is clearly deduced and legally correct; and, therefore, unless sufficient appears on the part of the defendant, will entitle the plaintiff to your verdict. To repel the plaintiff's right, and to establish his own, the defendant sets up a title.
1st. Under Connecticut.
2d. Under the Indians.
3d. Under Pennsylvania.

I. Under Connecticut.
The title under Connecticut is of no avail: Because the land in controversy is ex-territorial; it does not lie within the charter bounds of Connecticut, but within the charter-bounds of Pennsylvania. The charter of Connecticut does not cover or spread over the lands in question: Of course no title can be derived from Connecticut. Here then the defendant fails.

II. Under the Indians.
The Indian deed, under which the defendant claims, bears date the 11th of July 1754. It has been observed, that this *306 deed is radically defective and faulty; that fraud is apparent on the face of it; and, particularly, that the specification or description of the land is written on a razure. Of this, gentlemen, you will judge, as the deed will be given to you for inspection. Permit me to observe, that there are several ways, by which a deed may be voided or rendered of no effect. One of these is by razure, addition, interlining, or other alteration, in any material part, if done after its execution. It is the province of the jury to determine, whether any such alteration was made after the delivery of the deed.
Besides, this deed appears to have been executed at different times; and not in that open, public, national manner, in which the Indians sell and transfer their lands.
But if the deed was fairly obtained; if it has legal existence, then what is its legal operation?
By the charter to William Penn, the right of pre-emption attached, and was vested in him, to all the lands comprehended within its limits. The Penn family had, exclusively, the right of purchasing the lands of the Indians; and, indeed, the Indians entered into a stipulation of that kind.
Again, this deed is invalid by the laws of Pennsylvania. The Legislature of Pennsylvania, by an act passed the 7th Feb. 1705, declare; "That if any person presume to buy any land of the natives, within the limits of this province and territories, without leave from the proprietary thereof, every such bargain or purchase shall be void and of no effect." (1 Penn.Laws. Dall. Ed. 5.)
By an act passed the 14th Feb. 1729  30, it is further declared; "That every gift, grant, bargain, sale, written or verbal contract or agreement, and every pretended conveyance, lease, demise, and every other assurance made, or that shall hereafter be made, with any of the Indian natives, for any lands, &c. within the limits of this province, without the order or direction of the proprietary or is commissioners, shall be null, void, and of no effect." (1 Penn.Laws. Dall. Ed. 248.)
The land in controversy, being within the limits of Pennsylvania, the Connecticut settlers were, in legal estimation, trespassers and intruders. They purchased the land without leave, and entered upon it without right.
They purchased and entered upon the land without the consent of the Legislature of Connecticut. True it is, that the Legislature of Connecticut gave a subsequent approbation, but this was posterior to the deed executed by the Six Nations to Penn, at fort Stanwix, and the principle of relation does not retrospect so as to affect third persons.
The consequence is, that the Connecticut settlers derive no title under the Indian deed.
*307 III. The title which the defendant sets up under Pennsylvania.
This is the keystone of the defendant's title, as one of his counsel very properly expressed it. It required no great sagacity to perceive, that the defendant's hope of success was founded on a law of Pennsylvania, commonly called "the quieting and confirming act." This act, and the two subsequent ones of a suspending and a repealing nature, open an extensive and important field for discussion. In general verdicts, it frequently becomes necessary for juries to decide upon the law as well as the facts. To form a correct judgment, legal principles must be taken up and applied, and when this is done in a proper manner, it gives stability to judicial decisions, and security to civil rights. Hence uniformity and certainty; hence the decisions of tomorrow will be like the decisions of to-day; they will run in the same line, because they are founded on the same principles. To aid you, Gentlemen, in forming a verdict, I shall consider:
I. The constitutionality of the confirming act; or, in other words, whether the Legislature had authority to make that act?
Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no controul. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendant and has no bounds.
"The power and jurisdiction of Parliament, says Sir Edward Coke, is so transcendant and absolute, that it cannot be confined, either for causes or persons, within any bounds. And of this high court, he adds, it may be truly said, Si antiquitatem species, est vetustissima; si dignitatem, est honoratissima; si jurisdictionem, est capacissima. It has sovereign and uncontroulable authority in the making, confirming, enlarging, restraining, abrogating repealing, reviving, and expounding of laws, concerning matters of all possible denominations, ecclesiastical or temporal, civil, military, maritime, or criminal: This being the place where that absolute despotic power, which must in all governments reside somewhere, is entrusted by the constitution of there kingdoms. All mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal. It can regulate or new model the succession to the crown; as was done in the reign of Henry VIII. and William III. It can alter the established religion of the land; as was done in a variety of instances, in the reigns of king Henry VIII. and his three children. It can change and create afresh even the constitution of the kingdom and of Parliaments themselves; as was done by the act of union, and the several statutes for triennial and septennial elections. It can, in *308 short, do every thing that is not naturally impossible; and therefore some have not scrupled to call its power, by a figure rather too bold, the omnipotence of Parliament. True it is, that what the Parliament doth, no authority upon earth can undo." (1 Bl. Com. 160.)
From this passage it is evident, that, in England, the authority of the Parliament runs without limits, and rises above controul. It is difficult to say what the constitution of England is; because, not being reduced to written certainty and precision, it lies entirely at the mercy of the Parliament: It bends to every governmental exigency; it varies and is blown about by every breeze of legislative humour or political caprice. Some of the judges in England have had the boldness to assert, that an act of Parliament, made against natural equity, is void; but this opinion contravenes the general position, that the validity of an act of Parliament cannot be drawn into question by the judicial department: It cannot be disputed, and must be obeyed. The power of Parliament is absolute and transcendant; it is omnipotent in the scale of political existence. Besides, in England there is no written constitution, no fundamental law, nothing visible, nothing real, nothing certain, by which a statute can be tested. In America the case is widely different: Every State in the Union has its constitution reduced to written exactitude and precision.
What is a Constitution? It is the form of government, delineated by the mighty hand of the people, in which certain first principles of fundamental laws are established. The Constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is paramount to the power of the Legislature, and can be revoked or altered only by the authority that made it. The life-giving principle and the death-doing stroke must proceed from the same hand. What are Legislatures? Creatures of the Constitution; they owe their existence to the Constitution: they derive their powers from the Constitution: It is their commission; and, therefore, all their acts must be conformable to it, or else they will be void. The Constitution is the work or will of the People themselves, in their original, sovereign, and unlimited capacity. Law is the work or will of the Legislature in their derivative and subordinate capacity. The one is the work of the Creator, and the other of the Creature. The Constitution fixes limits to the exercise of legislative authority, and prescribes the orbit within which it must move. In short, gentlemen, the Constitution is the sun of the political system, around which all Legislative, Executive and Judicial bodies must revolve. Whatever may be the case in other countries, yet in this there can be no doubt, that every act of the Legislature, repugnant to the Constitution, is absolutely void.
*309 In the second article of the Declaration of Rights, which was made part of the late Constitution of Pennsylvania, it is declared: "That all men have a natural and unalienable right to worship Almighty God, according to the dictates of their own consciences and understanding; and that no man ought or of right can be compelled, to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent; nor can any man, who acknowledges the being of a God, be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments, or peculiar mode of religious worship; and that no authority can, or ought to be, vested in, or assumed, by any power whatever, that shall, in any case, interfere with, or in any manner controul, the right of conscience in the free exercise of religious worship." (Dec. of Rights, Art. 2.)
In the thirty-second section of the same Constitution, it is ordained; "that all elections, whether by the people or in general assembly, shall be by ballot, free and voluntary." (Const. Penn. sect. 32.)
Could the Legislature have annulled these articles, respecting religion, the rights of conscience, and elections by ballot? Surely no. As to these points there was no devolution of power; the authority was purposely withheld, and reserved by the people to themselves. If the Legislature had passed an act declaring, that, in future, there should be no trial by Jury, would it have been obligatory? No: It would have been void for want of jurisdiction, or constitutional extent of power. The right of trial by Jury is a fundamental law, made sacred by the Constitution, and cannot be legislated away. The Constitution of a State is stable and permanent, not to be worked upon by the temper of the times, nor to rise and fall with the tide of events; notwithstanding the competition of opposing interests, and the violence of contending parties, it remains firm and immoveable, as a mountain amidst the strife of storms, or a rock in the ocean amidst the raging of the waves. I take it to be a clear position; that if a legislative act oppugns a constitutional principle, the former must give way, and be rejected on the score of repugnance. I hold it to be a position equally clear and found, that, in such case, it will be the duty of the Court to adhere to the Constitution, and to declare the act null and void. The Constitution is the basis of legislative authority; it lies at the foundation of all law, and is a rule and commission by which both Legislators and Judges are to proceed. It is an important principle, which, in the discussion of questions of the present kind, ought never to be lost sight of, that the Judiciary in this country is not a subordinate, but co-ordinate, branch of the government.
*310 Having made these preliminary observations, we shall proceed to contemplate the quieting and confirming act, and to bring its validity to the test of the Constitution.
In the course of argument, the counsel on both sides relied upon certain parts of the late Bill of Rights and Constitution of Pennsylvania, which I shall now read, and then refer to them occasionally in the sequel of the charge.
(The Judge then read the 1st. 8th. and 11th articles of the Declaration of Rights; and the 9th. and 46th sections of the Constitution of Pennsylvania. See 1 Vol. Dall. Edit. Penn. Laws p. 55. 6. 60. in the Appendix.)
From these passages it is evident; that the right of acquiring and possessing property, and having it protected, is one of the natural, inherent, and unalienable rights of man. Men have a sense of property: Property is necessary to their subsistence, and correspondent to their natural wants and desires; its security was one of the objects, that induced them to unite in society. No man would become a member of a community, in which he could not enjoy the fruits of his honest labour and industry. The preservation of property then is a primary object of the social compact, and, by the late Constitution of Pennsylvania, was made a fundamental law. Every person ought to contribute his proportion for public purposes and public exigencies; but no one can be called upon to surrender or sacrifice his whole property, real and personal, for the good of the community, without receiving a recompence in value. This would be laying a burden upon an individual, which ought to be sustained by the society at large. The English history does not furnish an instance of the kind; the Parliament, with all their boasted omnipotence, never committed such an outrage on private property; and if they had, it would have served only to display the dangerous nature of unlimited authority; it would have been an exercise of power and not of right. Such an act would be a monster in legislation, and shock all mankind. The legislature, therefore, had no authority to make an act divesting one citizen of his freehold, and vesting it in another, without a just compensation. It is inconsistent with the principles of reason, justice, and moral rectitude; it is incompatible with the comfort, peace, and happiness of mankind; it is contrary to the principles of social alliance in every free government; and lastly, it is contrary both to the letter and spirit of the Constitution. In short, it is what every one would think unreasonable and unjust in his own case. The next step in the line of progression is, whether the Legislature had authority to make an act, divesting one citizen of his freehold and vesting it in another, even with compensation. That the Legislature, on certain emergencies, had authority to exercise this high power, has been urged from the *311 nature of the social compact, and from the words of the Constitution, which says, that the House of Representatives shall have all other powers necessary for the Legislature of a free state or commonwealth; but they shall have no power to add to, alter, abolish, or infringe any part of this Constitution. The course of reasoning, on the part of the defendant, may be comprized in a few words. The despotic power, as it is aptly called by some writers, of taking private property, when state necessity requires, exists in every government; the existence of such power is necessary; government could not subsist without it; and if this be the case, it cannot be lodged any where with so much safety as with the Legislature. The presumption is, that they will not call it into exercise except in urgent cases, or cases of the first necessity. There is force in this reasoning. It is, however, difficult to form a case, in which the necessity of a state can be of such a nature, as to authorise or excuse the seizing of landed property belonging to one citizen, and giving it to another citizen. It is immaterial to the state, in which of its citizens the land is vested; but it is of primary importance, that, when vested, it should be secured, and the proprietor protected in the enjoyment of it. The constitution encircles, and renders it an holy thing. We must, gentlemen, bear constantly in mind, that the present is a case of landed property; vested by law in one set of citizens, attempted to be divested, for the purpose of vesting the same property in another set of citizens. It cannot be assimilated to the case of personal property taken or used in time of war or famine, or other extreme necessity; it cannot be assimilated to the temporary possession of land itself, on a pressing public emergency, or the spur of the occasion. In the latter case there is no change of property, no divestment of right; the title remains, and the proprietor, though out of possession for a while, is still proprietor and lord of the soil. The possession grew out of the occasion and ceases with it: Then the right of necessity is satisfied and at an end; it does not affect the title, is temporary in its nature, and cannot exist forever. The constitution expressly declares, that the right of acquiring, possessing, and protecting property is natural, inherent, and unalienable. It is a right not ex gratia from the legislature, but ex debito from the constitution. It is sacred; for, it is further declared, that the legislature shall have no power to add to, alter, abolish, or infringe any part of, the constitution. The constitution is the origin and measure of legislative authority. It says to legislators, thus far ye shall go and no further. Not a particle of it should be shaken; not a pebble of it should be removed. Innovation is dangerous. One incroachment leads to another; precedent gives birth to precedent; what has been done may be done again; thus radical principles are generally broken in upon, and the constitution *312 eventually destroyed. Where is the security, where the inviolability of property, if the legislature, by a private act, affecting particular persons only, can take land from one citizen, who acquired it legally, and vest it in another? The rights of private property are regulated, protected, and governed by general, known, and established laws; and decided upon, by general, known, and established tribunals; laws and tribunals not made and created on an instant exigency, on an urgent emergency, to serve a present turn, or the interest of a moment. Their operation and influence are equal and universal; they press alike on all. Hence security and safety, tranquillity and peace. One man is not afraid of another, and no man afraid of the legislature. It is infinitely wiser and safer to risk some possible mischiefs, than to vest in the legislature so unnecessary, dangerous, and enormous a power as that which has been exercised on the present occasion; a power, that, according to the full extent of the argument, is boundless and omnipotent: For, the legislature judged of the necessity of the case, and also of the nature and value of the equivalent.
Such a case of necessity, and judging too of the compensation, can never occur in any nation. Singular, indeed, and untoward must be the state of things, that would induce the Legislature, supposing they had the power, to divest one individual of his landed estate merely for the purpose of vesting it in another, even upon full indemnification; unless that indemnification be ascertained in the manner which I shall mention hereafter.
But admitting, that the Legislature can take the real estate of A. and give it to B. on making compensation, the principle and reasoning upon it go no further than to shew, that the Legislature are the sole and exclusive judges of the necessity of the case, in which this despotic power should be called into action. It cannot, on the principles of the social alliance, or of the Constitution, be extended beyond the point of judging upon every existing case of necessity. The Legislature declare and enact, that such are the public exigencies, or necessities of the State, as to authorise them to take the land of A. and give it to B. the dictates of reason and the eternal principles of justice, as well as the sacred principles of the social contract, and the Constitution, direct, and they accordingly declare and ordain, that A. shall receive compensation for the land. But here the Legislature must stop; they have run the full length of their authority, and can go no further; they cannot constitutionally determine upon the amount of the compensation, or value of the land. Public exigencies do not require, necessity does not demand, that the Legislature should, of themselves, without the participation of the proprietor, or intervention of a jury, assets *313 the value of the thing, or ascertain the amount of the compensation to be paid for it. This can constitutionally be affected only in three ways.
1. By the parties  that is, by stipulation between the Legislature and proprietor of the land.
2. By commissioners mutually elected by the parties.
3. By the intervention of a Jury.
The compensatory part of the act lies in the ninth section.
"And whereas the late proprietaries, and divers other persons have heretofore acquired titles to parcels of the land aforesaid, agreeably to the laws and usages of Pennsylvania, and who will be deprived thereof by the operation of this act, and as justice requires, that compensation be made for the lands, of which they shall be thus divested; and as the State is possessed of other lands, in which an equivalent may be rendered to the claimants under Pennsylvania, and as it will be necessary, that their claims should be ascertained by a proper examination: Be it therefore enacted, by the authority aforesaid, That all persons having such claims to lands, which will be affected by the operation of this act, shall be, and they are hereby required, by themselves, guardians, or other lawful agents, within twelve months from the passing of this act, to present the same to the Board of Property, therein clearly describing those lands, and stating the grounds of their claims, and also adducing the proper proofs, not only of their titles, but of the situations, qualities, and values of the lands so claimed, to enable the Board to judge of the validity of their claims, and of the quantities of vacant lands proper to be granted as equivalents. And for every claim, which shall be admitted by said Board, as duly supported, the equivalent, by them allowed, may be taken either in the old or new purchase, at the option of the claimant; and warrants, and patents, and all other acts of the public offices relating thereto, shall be performed free of expence. The said Board shall also allow such a quantity of vacant land, to be added to such equivalent, as shall, in their judgment, be equal to the expences, which must necessarily be incurred in locating and surveying the same. And that the Board of Property may, in every case obtain satisfactory evidence of the quality and value of the land, which shall be claimed as aforesaid, under the proprietary title, they may require the commissioners aforesaid, during their sitting in the County of Luzerne, to make the necessary enquiries, by the oaths or affirmations of lawful witnesses, to ascertain those points; and it shall be the duty of the said commissioners to enquire and report accordingly." (Act of Penn. 28th March 1789. sect. 9.)
In this section two things are worthy of consideration.
*314 1. The mode or manner, in which compensation for the lands is to be ascertained.
2. The nature of the compensation itself.
The Pennsylvania claimants are directed to present their claims to the Board of Property  and what is the Board to do thereupon? Why, it is,
1. To judge of the validity of their claims.
2. To ascertain, by the aid and through the medium of commissioners, appointed by the Legislature, the quality and value of the land.
3. To judge of the quantity of vacant land to be granted as an equivalent.
This is not the constitutional line of procedure. I have already observed, that there are but three modes, in which matters of this kind can be conducted consistently with the principles and spirit of the Constitution, and social alliance. The first of which is by the parties, that is to say, by the Legislature and proprietor of the land. Of this the British history presents an illustrious example in the case of the Isle of Man.
"The distinct jurisdiction of this little subordinate royalty being found inconvenient for the purposes of public justice, and for the revenue (it affording a commodious asylum for debtors, outlaws, and smugglers) authority was given to the treasury, by statute 12. Geo. l.c. 28, to purchase the interest of the then proprietors for the use of the Crown; which purchase was at length compleated in the year 1765, and confirmed by statutes 5 Geo. III. c. 26 and 38, whereby the whole island and all its dependencies, so granted as aforesaid (except the landed property of the Atholl family, their manerial rights and emoluments, and the patronage of bishopricks, and other ecclesiastical benefices) are unalienably vested in the Crown, and subjected to the regulations of the British excise and customs." 1 Bl. Com. 107.
Shame to American legislation! That in England, a limited monarchy, where there is no written constitution, where the Parliament is omnipotent, and can mould the Constitution at pleasure, a more sacred regard should have been paid to property, than in America, surrounded as we are with a blaze of political illumination; where the Legislatures are limited; where we have republican governments, and written Constitutions, by which the protection and enjoyment of property are rendered inviolable.
The case of the Isle of Man was a fair and honorable stipulation; it partook of the spirit and effence of a contract; it was free and mutual; and was treating with the proprietors on equal terms. But if the business cannot be effected in this way, then the value of the land, intended to be taken, should be ascertainary commissioners, or persons mutually elected by the parties, *315 of by the intervention of the Judiciary, of which a Jury is a component part. In the first case, we approximate nearly to a contract; because the will of the party, whose property is to be affected, is in some degree exercised; he has a choice; his own act co-operates with that of the Legislature. In the other case, there is the intervention of a court of law, or, in other words, a jury is to pass between the public and the individual, who, after hearing the proofs and allegations of the parties, will, by their verdict, fix the value of the property, or the sum to be paid for it. The compensation, if not agreed upon by the parties or their agents, must be ascertained by a jury. The interposition of a jury is, in such case, a constitutional guard upon property, and a necessary check to legislative authority. It is a barrier between the individual and the legislature, and ought never to be removed; as long as it is preserved, the rights of private property will be in no danger of violation, except in cases of absolute necessity, or great public utility. By the confirming act, the value of the land taken, and the value of the land to be paid in recompense, are to be ascertained by the Board of Property. And who are the persons that constitute this board? Men appointed by one of the parties, by the Legislature only. The person, whose property is to be divested and valued, had no volition, no choice, no co-operation in the appointment; and besides, the other constitutional guard upon property, that of a jury, is removed and done away. The Board of Property thus constituted, are authorised to decide upon the value of the land to be taken, and upon the value of the land to be given by way of equivalent, without the participation of the party, or the intervention of a jury.
2. The nature of the compensation.
By the act the equivalent is to be in land. No just compensation can be made except in money. Money is a common standard, by comparison with which the value of any thing may be ascertained. It is not only a sign which represents the respective values of commodities, but is an universal medium, easily portable, liable to little variation, and readily exchanged for any kind of property. Compensation is a recompence in value, a quid pro quo, and must be in money. True it is, that land or any thing else may be a compensation, but then it must be at the election of the party; it cannot be forced upon him. His consent will legalise the act, and make it valid; nothing short of it will have the effect. It is obvious, that if a jury pass upon the subject; or value of the property, their verdict must be in money.
To close this part of the disclosure: It is contended that the Legislature must judge of the necessity of interposing their despotic authority; it is a right of necessity upon which no other *316 power in government can decide: That no civil institution is perfect; and that cases will occur, in which private property must yield to urgent calls of public utility or general danger. Be it so. But then it must be upon complete indemnification to the individual. Agreed: But who shall judge of this? Did there also exist a state necessity, that the Legislature, or persons solely appointed by them, must admeasure the compensation, or value of the lands seized and taken, and the validity of the title thereto? Did a third state necessity exist, that the proprietor must take land by way of equivalent for his land? And did a fourth state necessity exist, that the value of this land-equivalent must be adjusted by the board of property, without the consent of the party, or the interference of a Jury? Alas! how necessity begets necessity. They rise upon each other and become endless. The proprietor stands afar off, a solitary and unprotected member of the community, and is stript of his property, without his consent, without a hearing, without notice, the value of that property judged upon without his participation, or the intervention of a Jury, and the equivalent therefor in lands ascertained in the same way. If this be the Legislation of a Republican Government, in which the preservation of property is made sacred by the Constitution, I ask, wherein it differs from the mandate of an Asiatic Prince? Omnipotence in Legislation is despotism. According to this doctrine, we have nothing that we can call our own, or are sure of for a moment; we are all tenants at will, and hold our landed property at the mere pleasure of the Legislature. Wretched situation, precarious tenure! And yet we boast of property and its security, of Laws, of Courts, of Constitutions, and call ourselves free! In short, gentlemen, the confirming act is void; it never had Constitutional existence; it is a dead letter, and of no more virtue or avail, than if it never had been made.
II. But, admitting the confirming act to be Constitutional and valid, the next subject of enquiry is, what is its operation, or, in other words, what construction ought to be put upon it.
It is contended, on the part of the defendant, that on the passing of the act, the estate was divested from the Pennsylvania claimants, and instantly vested in the Connecticut settlers. To decide upon this question, it will not be amiss to lay down a rule or two of exposition, applicable to the act under consideration.
A statute shall never have an equitable construction in order to overthrow or divest an estate.
Every statute, derogatory to the rights of property, or that takes away the estate of a citizen, ought to be construed strictly.
*317 Let us test this act by the foregoing rules. The act is entitled, "An act, for ascertaining and confirming to certain persons, called Connecticut claimants, the lands by them claimed within the county of Luzerne, and for other purposes therein mentioned," and was passed the 28th of March, 1787.
The first five sections, being material in the discussion of this part of the subject, run in the following words.

(Here the Judge read the Law.)
The act requires,
That the Connecticut settlers shall prefer their claims to the commissioners.
That they shall support their claims by reasonable proof. That the commissioners shall adjudicate upon or confirm the claims.
That they shall have the lots, to which claims are set up and admitted, surveyed; that they shall make return of their surveys and their book of entries to the Supreme Executive Council, who shall cause patents to be issued for their confirmation, and each patent shall comprehend all the parcels of land, which are to be confirmed to the same claimant, to whom, by the return of the commissioners, the same shall be found to belong.
The mere offering or presenting of the claim is not sufficient. It must be supported by reasonable proof, and ascertained, and established by the Commissioners. There acts must be performed before the estate passes out of the Pennsylvania claimants, and is vested in the Connecticut settlers. They are antecedent acts, and in nature of a condition precedent. Now conditions precedent are such as must happen or be performed before the estate can vest or be enlarged; they admit of no latitude; they must be strictly, literally, and punctually performed. It is a known maxim, that where the estate is to arise upon a condition precedent, it cannot vest till that condition is performed; and this has been so strongly adhered to, that even where the condition has become impossible, no estate or interest grew thereupon. Where a condition copulative precedes an estate, the whole must be performed before the estate can arise; or where an act is previous to any estate, and that act consists of several particulars, every particular must be performed before the estate can vest or take effect. Co. Lit. 206, 218. 1 Atk. 374. 376. Com Rep. 732.
The estate of the Pennsylvania claimants was not divested on the passing of the act; it was not divested on presenting the claim on the part of the Connecticut settlers. Other acts were previously necessary, and, in particular, the commissioners must pass upon and confirm the claim, before the estate is divested from the one party and vested in the other. These things precede, *318 and must be done before any estate can vest in the defendant; but they have not been done, and therefore the estate remains in the plaintiff. This construction corresponds with the meaning and spirit, the tendency and scope, of the act itself. The intention of the Legislature was to vest in Connecticut claimants of a particular description a perfect estate to certain lands in the County of Luzerne; but then it was upon condition; it was to operate upon, secure, and sanctify, such claims only as should be admitted and ascertained, approved and established, by the Commissioners. This is further evident from the powers and functions of the commissioners, who were to enquire, examine, hear proofs, &c. respecting the claims; and for what purpose? Why, that they might admit and approve of such as were supported by satisfactory evidence, and make return thereof to the Executive Council, who should thereupon cause patents to be issued for their confirmation. Until the commissioners had decided in favor of a claim, it remained in statu quo; the act did not cover and protect it. Further, if the act will admit of two constructions, that one certainly ought to be adopted, which is in favor of the legal owner, and which will not divest his estate, till the terms specified in the act shall have been fully complied with. When the Legislature undertake to give away what is not their own, when they attempt to take the property of one man, which he fairly acquired, and the general law of the land protects, in order to transfer it to another, even upon complete indemnification, it will naturally be considered as an extraordinary act of legislation, which ought to be viewed with jealous eyes, examined with critical exactness, and scrutinized with all the severity of legal exposition. An act of this sort deserves no favor; to construe it liberally would be sinning against the rights of private property.
Besides, it was the manifest intention of the makers of the act, that a just compensation should be made in land, to the Pennsylvania claimants; upon this principle the act proceeds; and therefore, if it appear, that such compensation cannot be made, or that it is very dubious, whether it can be effected, the Court ought not to give such a construction, as will deprive the owner of his estate, with little or no prospect of being recompensed in value. If either party ought to be driven to the necessity of controverting the question with the state of Pennsylvania, it ought to be the Connecticut settlers, who have no legal title to the land, and not the Pennsylvania claimants, in whom is vested a good estate at law.
Deeming the construction, which has been put upon the act, to be the found one, it precludes the enquiry, how far a patent of confirmation was necessary to substantiate the claim of the *319 defendant, so as to render it available in a court of common law.
III. The nature and operation of the suspending act.
This act was passed the 29th of March, 1788, and is as follows.

(Here the Judge read the act at large.)
This act was passed before the adoption of the Constitution of the United States, and therefore is not affected by it. If the Legislature had authority to make the confirming act, they had, also, authority to suspend it. Their Constitutional power reached to both, or to neither. By the act of the 28th of March 1787, the commissioners were to ascertain and confirm the claims of the Connecticut settlers, upon the doing whereof the estate, if the law was Constitutional, would become vested in them. This has not been done; the claim in the present instance has not been ascertained and confirmed; and as this act suspends or revokes these ascertaining and confirming powers, it never can be done. Of course, there is an end of the business. The parties are placed on their original ground; they are restored to their pristine situation.
IV. After the opinion delivered on the preceeding questions, it is not necessary to determine upon the validity of the repealing law. But it being my intention in this charge to decide upon all the material points in the cause, in order that the whole may, at once, be carried before the Supreme Judicature for revision, I shall detain you, gentlemen, a few mintutes only, while I just touch upon the Constitutionality of the repealing act. This act was passed the 1st of April 1790: The repealing part is as follows.
(Here the Judge read the 1st and 2d sections of the act. See 2 Vol. Dall. Edit. Penn. Laws. p. 786.)
This act was made after the adoption of the Constitution of the United States, and the argument is, that it is contrary to it:
1. Because it is an ex post facto law.
2. Because it is a law impairing the obligation of a contract
1. That it is an ex post facto law. But what is the fact? If making a law be a fact within the words of the Constitution, then no law, when once made, can ever be repealed. Some of the Connecticut settlers presented their claims to the commissioners, who received and entered them. These are facts. But are they facts of any avail? Did they give any right or vest any estate? No  whether done or not done, they leave the parties just where they were. They create no interest, affect no title, change no property, when done they are useless and of no efficacy. Other acts were necessary to be performed, but *320 before the performance of them, the law was suspended and then repealed.
2. It impairs the obligation of a contract, and is therefore void. If the property to the lands in question had been vested in the State of Pennsylvania, then the Legislature would have had the liberty and right of disposing or granting them to whom they pleased, at any time, and in any manner. Over public property they have a disposing and controlling power, over private property they have none, except, perhaps, in certain cases, and those under restrictions, and except also, what may arise from the enactment and operation of general laws respecting property, which will affect themselves as well as their constituents. But if the confirming act be a contract between the Legislature of Pennsylvania and the Connecticut settlers, it must be regulated by the rules and principles, which pervade and govern all cases of contracts; and if so, it is clearly void, because it tends, in its operation and consequences, to defraud the Pennsylvania claimants, who are third persons, of their just rights; rights ascertained, protected, and secured by the Constitution and known laws of the land. The plaintiff's title to the land in question, is legally derived from Pennsylvania; how then, on the principles of contract, could Pennsylvania lawfully dispose of it to another? As a contract, it could convey no right, without the owner's consent; without that, it was fraudulent and void.
I shall close the discourse with a brief recapitulation of its leading points.
1. The confirming act is unconstitutional and void. It was invalid from the beginning, had no life or operation, and is precisely in the same state, as if it had not been made. If so, the plaintiff's title remains in full force.
2. If the confirming act is constitutional, the conditions of it have not been performed; and, therefore, the estate continues in the plaintiff.
3. The confirming act has been suspended  and
4. Repealed.
The result is, that the plaintiff is, by law, entitled to recover the premises in question, and of course to your verdict.
Verdict for the Plaintiff.[*]
NOTES
[*] Nov. 5th 1768.
[*] 29th Octob. 1768.
[] 8th & 9th Dec. 1768.
[] 1st March. 1769.
[§] Feb. & March 1771.
[] 15th Jan. 1772.
[**] 17th Jan. 1772.
[] 15th Nov. 1774.
[*] Writ of Error was brought on the Judgment in this case, and is now depending in the Supreme Court.