*81 By the Court,
Bronson, J.
As the plaintiffs made out a perfect title to the property, it is only necessary to examine the claim set up by the defendant under the assessment and sale for making a well and pump in Willow-street. The first enquiry will be, whether, assuming all the proceedings to have been regular, there was any legal authority for selling the land. It has become so common of late to take private property in one form or another without the consent of the owner, that corporations are not always very careful to look at their charters; or if they are examined, the powers conferred are construed very liberally. But the right to take private property in any form without the consent of the owner, is a high prerogative of sovereignty, which no individual or corporation can exercise without an express grant. The poxver may be delegated, but the delegation must plainly appear. It cannot be made out by doubtful inferences from powers relating to other subjects. Nothing short of express words, or necessary implication, will answer the purpose.(a)
The village of Brooklyn was incorporated in 181.6, the charter was amended in 1824, and these laws were, with some modifications, reduced into one act in 1827. (Stat. of 1816, p. 90 ; 1824, p. 224; 1827, p. 127.) The act of 1816 provided for levying taxes upon the freeholders and inhabitants of the whole village, but not for making assessments within any more limited district. The act of 1824 authorized the trustees to order and direct the pitching, paving, altering, amending and cleansing of streets within the village, and to cause the expense of conforming to such regulations to be assessed among the owners and occupants of the houses and lots intended to be benefitted thereby; and the trustees were authorized, by warrant under their hands and seals, to levy the assessment by distress and sale of the goods and chattels of *82 the owner or occupant who should make default in payment. (§ 3.) By the eighth section of that act, the trustees were authorized to divide the village into well and pump districts, to provide wells and pumps, and to assess and collect the expenses of those works in the same manner as was provided in relation to street assessments by the third section of the act. Thus far it is quite clear that there is no power to sell lands for making wells and pumps. The assessments are to be collected by distress and sale of the goods and chattels of the persons assessed.
But it is said that the power to sell lands for these assessments may be found in the seventh section of the act, which provides, “ that whenever any tax of any description on lands or tenements in the said village shall remain unpaid,” and the collector shall make affidavit “ that the owner or owners of the premises on which the same is imposed ” cannot be found, or that he has not sufficient personal estate in the village whereon the tax can he levied, the trustees may take order, for advertising in a newspaper for the space of three mo'nths, “ thereby requiring the owners of such lands and tenements respectively” to pay the tax, and that in case of default, “ such lands and tenements” will be sold j c< and if, notwithstanding such notice,” the tax shall not be paid, “ then it shall and may be lawful for the said trustees to cause such lands and tenements to be sold at auction for a term of years.” Now, the first remark upon this section is, that it only authorizes the sale of lands for the payment of a tax ; and although it extends to a tax” of any description,” still it includes nothing but a tax of some kind. Our laws have made a plain distinction between taxes, which are burdens or charges imposed upon persons or property to raise money for public purposes, and assessments for city and village improvements, which are not regarded as burdens, but as an equivalent or compensation for the enhanced value wrhich the property of the person assessed has derived from the improvement. This distinction had been made in several statutes long before Brooklyn was incorporated, and was- fully exem *83 plified in the Matter of the Mayor of New-York, (11 John. R. 77.) There, several churches in the city of New-York had been assessed for the supposed benefit which they would derive from the enlarging of Nassau-street, and they denied the legality of the assessment, because it had been expressly enacted that no church or place of public worship “ shall be taxed by any law of this state.” But the objection was overruled, and the exemption claimed by the churches denied, on. the ground that the assessment could, not properly be regarded as a tax. This case apparently goes the whole length of deciding the one now before us. The authority is to sell for a tax, and the defendant shows nothing but an assessment for a village improvement. In Bleecker v. Ballou, (3 Wend. 263,) the question was upon an assessment for pitching and paving a street, and Savage, Ch. J. said, “ there is no doubt that the assessment in question was not a tax, that being a sum imposed, as is supposed, for some public object.”(b)
I may remark here, that the charter provides in terms for laying taxes for various purposes, and there is, therefore, no necessary implication that assessments were intended to be included in the word 66 tax,” which is the only word in the seventh section from which the power can be inferred.
A corporation must show a grant, either in terms or by necessary implication, for all the powers which it attempts to exercise ; and especially must this be done, when it claims the right, by taxing or otherwise, to divest individuals of their property without their consent. In Beaty v. Knowler, (4 Peters, 152,) which was the case of a corporation sale of lands for taxes, Mr. Justice McLean remarked, “ that a corporation is strictly limited to the exercise of those powers which are specially conferred upon it. The exercise of the corporate franchise, being restrictive of individual rights, cannot be ex *84 tended beyond the letter and spirit of the act of incorporation.” And he subsequently adds : “ The power to impose a tax on real estate, and to sell it where there is a failure to pay the tax, is a high prerogative, and should never be exercised where the right is doubtful.” The justice of the remark is obvious. Every statute derogatory to the rights of property, or that takes away the estate of a citizen, ought to be construed strictly. It should never have an equitable construction. ( Vanhorne's lessee v. Dorrance, 2 Dall. 316.)
The act of 1824 was drawn and passed long after the distinction had been taken between assessments and taxes, and those who drew and those who passed it must be supposed to have known that an assessment for the benefits conferred by a village improvement was not included in the word “ tax.” Had the legislature intended that lands should be sold to satisfy assess ments, it cannot be doubted that they would have said so.
A further examination of the statute will go to confirm what has already been said. The corporation is not empowered to sell lands in those cases where there is in fact a tax, unless it be a tax on lands, and not a mere personal charge. The words are—(t Whenever any tax of any description on lands or tenements in the said village shall remain unpaid,” the trustees may “ cause suck lands and tenements to be sold.” (§ 7.) On looking at the eighth section which authorizes an assessment for wells and pumps, in connection with the third section to wdiich the eighth refers, it will be seen that the assessment is not upon the lands, but upon u the owners or occupants of the houses and lots intended to be benefited thereby,” and the money is to be levied “ by distress and sale of the goods and chattels of such owner or occupant.” This language does not go beyond the creation of a debt or duty upon the owner in respect of the land, which he must satisfy at the peril of losing his goods. It does not create a charge on the land.
I have not overlooked the fact that street assessments are, by the third section of the act, made a lien or charge on the land. Whether that fact, taken in connection with the power confer *85 red by the seventh section, will authorize a sale of lands for street assessments, we are not now called upon determine. If the power be conceded, it does not follow that there may be a sale of lands for a well and pump assessment. The eighth section, which relates to wells and pumps, makes no mention of the seventh, which provides for a sale of lands ; arid it only refers to the third for the purpose of avoiding the repetition of details in relation to the mode of collecting the assessment. The substance of the provision is, that assessments for wells and pumps maybe made and collected “ in the same manner as is provided for assessing and collecting” street expenses “by the third section of this act.” That “ manner/’ as we have , already seen, is, “ by distress and sale of the goods and chattels” of the person assessed.
These assessment sales for real or fancied improvements sometimes fall very heavily upon the owners of city and village property. The lots which are sold are usually vacant, and consequently produce no revenue. If there were an occupant, there would of course be a person to discharge the burden. The loss resulting from a sale most commonly falls upon absent owners, who have no notice until it is too late— upon women, who are not accustomed to watch the movements of a corporation and its officers—and upon children, who want discretion to defend and protect their rights. And although the power to sell lands without regard to age, sex or condition, has been very liberally conferred by our city and village charters, it may well be that the legislature did not in this instance deem it expedient to make such a grant. They supposed it. enough that owners and occupants were made liable where they could be reached by distress and sale of their goods, and did not regard it as a very great evil if the absent owner of an unoccupied lot should escape the payment of an assessment for a well and pump which could not then and might never be of any importance, to him. But whatever reasons may have influenced the legislature, we feel no difficulty in saying that this land has been sold without legal authority.
*86 The act of 1827 was in force at the time the sale was made. But as the 22d section of that act is substantially the same as the 7th section of the act of 1824, it requires no separate consideration.
We might stop here. But there are other questions in the cause, which, like the one already considered, were elaborately discussed at the bar, and both parties appeared to wish that we should pass upon them. I will now assume, what has just been denied, that this charter confers authority to sell lands for a well and pump assessment, and then the enquiry will be whether the defendant has made out such an execution of the power as is necessary to establish his title under the sale. In the solution of this question, it will be proper at the outset to lay down a few principles which must have an important bearing upon -the result. ■
Every statute authority, in derogation of the common law, to divest the title of one and transfer it to another, must be strictly pursued, or the title will not pass. This is a mere naked power in the corporation, and its due execution is not to be made out by intendment: it must be proved. It is not a case for presuming that public officers have done their duty, but what they have in fact done must be shown. The recitals m the conveyance are not evidence against the owners of the property, but the fact recited must be established by proofs aliunde. As the statute has not made the conveyance prima facie evidence of the regularity of the proceedings, the fact that they were regular must be proved, and the onus rests on the purchaser. He must show, step by step, that every thing has been done which the statute makes "essential to the due execution of the power. It matters not that it may be difficult for the purchaser to comply with such a rule. It is his busii ness to collect and preserve all the facts and muniments upon which the validity of his title depends. (Rex v. Croke, Cowp. 26; Williams v. Peyton, 4 Wheat. 77; Ronkendorf v. Taylor, 4 Peters, 349; Jackson v. Shepard, 7 Cowen, 88 ; Atkins v. Kinnan, 20 Wend. 241; Thatcher v. Powell, 6 Wheat. 119; *87 Jackson v. Esty, 7 Wend. 148; The People v. Mayor &c. N. Y. 2 Hill, 9 ; Matter of Mount Morris Square, id. 14.) (c) These cases and those to which they refer will be sufficient to justify all that has been said concerning the necessary requisites for making out a title in the defendant.
Let us now recur once more to the power. The 8th section of the act of 1824 provides, that it shall be lawful for the trustees “ on the application in writing of a majority of the persons owning property intended to be benefitted thereby, or whose property shall be assessed for the payment of the expenses attending the same, to divide the said village into pump and well districts.” The defendant produced a petition having seven names subscribed to it, but he gave no evidence to show that the signatures were genuine, nor did he prove that they were owners of property within the proposed district. But this is not all. The petition was only signed by seven individuals, and fourteen were assessed for the improvement. • The petitioners were not “ a majority of the persons owning property intended to be benefitted.” In answer to this it is said, that some persons were assessed whose property lay beyond the permanent district. But an assessment upon their property was expressly directed by the trustees, and the inference is irresistible that they were persons a intended to be benefitted” by the improvement. Again, the petition was for a well in Willow, between Clark and Pierpont streets, and that petition was granted ; but when the trustees ordered an assessment, the district was altered, and bounded on one side by Love-lane instead of Pierpont-street. How many persons would have been assessed if the district on which the petition was based had remained unaltered, we are not informed. The fact that a majority petitioned for the improvement lies at the foundation of *88 the whole proceeding; and, unless that fact can be established, the whole is void from beginning to end. The onus was upon the defendant, and he has failed to furnish the proof.
The defendant insists that the petition conferred jurisdiction on the trustees to lay out a well and pump district &c., provided they should judge that a majority of the persons intended to be benefitted had signed ; that, by granting the petition and proceeding with the work, the trustees adjudicated upon the question, and determined that a majority had petitioned; and that this judgment of the trustees is conclusive upon all persons so long as it remains unreversed. It is impossible to maintain that in this matter the trustees were sitting as a court of justice, with power to conclude any one by their determination. True, they were called upon to decide for themselves whether a case had arisen in which it was proper for them to act. But they acted at their peril. They could not make the occasion by resolving that it existed. They had power to proceed if a majority petitioned, but without such a petition they had no authority whatever. They could not create the power by resolving that they had it. In Graves v. Otis, (2 Hill, 466,) the trustees had the necessary petition in point of numbers, and, so far as any one could see on looking at the paper, all was regular. But it turned out that, after two persons had signed the petition, a material alteration had been made in it, without their consent; and as these two names were necessary to make out the requisite number, it was held that the trustees had no jurisdiction. This seems to be a hard case, and so it was; but it stands upon a principle which cannot be given up with safety to the public. Corporations and their officers, when they interfere with the rights of individuals, and especially when they attempt to divest and transfer the title to real estate, must show that the very case has arisen in which they were authorized to proceed. Showing that they have been misled by forgery will not aid them. Honest error cannot confer power.
If the petition had been sufficient, and the trustees had thus *89 acquired jurisdiction to act, then whether they would proceed or not, was a question addressed to their discretion; and their decision upon that question could not be reviewed in this action, nor, indeed, in any other. But without a sufficient petition they had no authority to act. There is little, if any thing, of a judicial nature in the proceedings of corporations to take lands either by way of assessments or for public use. (The People v. The Mayor &c. of New-York, 2 Hill, 9 ; Matter of Mount Morris Square, 2 Hill, 14.) It is the mere execution of a power.
I will now assume that the trustees acquired jurisdiction, and then the enquiry will be whether all the necessary steps have been taken to transfer the plaintiffs’ title to the defendant. I will not stop to enquire whether the district was properly laid out, hut proceed at once to the consideration of the assessment. The expenses of the improvement were to be assessed “ among the owners and occupants of all the houses and lots intended to be benefited thereby.” (Act of 1824, § 8, 3.) And there is no authority to sell except where a “ tax [or an assessment, as has been conceded for the purposes of this branch of the argument] of any description on lands or tenements in the said village shall remain unpaid.” In order to lay a tax H on lands or tenements,” it is necessary that the particular lands should be mentioned and described. Now what was done here 1 Without noticing any other defects in the extraordinary document which is called an assessment, it is sufficient to say, that the assessors have not even mentioned or alluded to any a lands or tenements” from beginning to end. In several instances enough was not done to create even a personal charge. Take for example the following: “ Sharp, 19,76.” What u Sharp” was intended 1 After the trustees had directed the assessors to aid the collector in describing the lands—in other words, to do what should have been done when the assessment was made—the trustees passed a resolution reciting that a tax was due from “ Mrs. Sharpe but what particular lady of that name was intended was not explained. If they *90 meant Mrs. Mary Sharpe, who once owned the land, she died •in 1823, two years before the well and pump had been thought of.' At the time these proceedings were commenced the land belonged to the seven minor grandchildren of Mary Sharpe, who are the plaintiffs in this action. The fact that Mrs. Sharpe had been long dead, enabled the collecter to make the necessary affidavit that she could not “ upon diligent enquiry be found in said village,” Had the plaintiffs, the owners of the land, been named in the assessment, there is no reason to suppose that the necessary affidavit could have been made, or that the tax would not have been paid, and the land saved. The assessment neither created a charge on the land, nor a debt or duty upon the plaintiffs.
If the defect in the assessment could be afterwards supplied, it was never done. After the assessors had been required to aid the collector in describing the lands, and after the.collector had made his affidavit, the trustees only made a slight approximation towards describing the land which they intended to sell. They stated that an assessment was due “ from Mrs. Sharp, on property in Willow-street.” In what part of Willow-street, on which side of it, and how much property 1 Was it one lot or ten, and what were the dimensions I It is impossible to call this a description of any property in particular. There was no description of the lot in question until we get down to the conveyance made on the sale. The owners were left in the dark until it was too late to save the land.
This leads to the mention of the last defect in the proceedings which I shall notice; to wit, that the land was not sufficiently described in the advertisement. When a tax on lands or tenements remains unpaid, the trustees may take order for advertising the same, requiring the owner of such lands to pay the tax, or in default, that such lands will be sold, and if the tax is not paid within the specified time, such la?ids may be sold. (Sess. L. of 1824, p. 227, § 7.) The principal object in requiring the advertisement was, to bring home notice to the owner that his land was to be sold if he did not pay the charge upon it. And on *91 ly such land can be sold as has been advertised. Now what was this notice 1 It neither named the plaintiffs, nor did it describe the property. Among the unpaid assessments for various improvements in the village, it mentions that there was due u from Mrs. Sharp, assessed on land in Willow-street near Clark-street, containing on said Willow-street thirty-five feet, $19,76.” The notice does not state in what part of Willow-street the property was situate, except that it was “ near Clark-street,” nor does it mention the side of the street. The plaintiffs owned property on both sides. Again, it is thirty-five feet on Willow-street, but the notice does not state how long the lot was the other way, or whether it was in the form of a square, a parallelogram, or a triangle. And besides, there is not only a want of description, but the notice was directly calculated to mislead the owners. It speaks of a lot thirty-five feet on Willow-street, and the lot sold was thirty-eight feet front on that street. It mentions land “ near Clark-street,” and the lot sold was on Clark-street, by which one side of one hundred and thirteen feet was bounded. No one who owned this corner lot would imagine that he was in danger from seeing that the corporation proposed to sell a lot near Clark-street, especially as there was nothing else in the advertisement to correct the error. It was so natural and easy to describe this as a corner lot, or a lot bounded on two sides by the two streets, that it is difficult to resist the inference that the corporation either did not know what land would be sold at the time the notice was given, or that pains were taken to mislead the owners, and throw them off their guard. But however that may be, the notice was insufficient.
On each and all of these grounds we are of opinion that the sale was void, and conferred no title on the purchaser.
We were told by the defendant’s counsel that the conclusion at which we have arrived would disturb many titles. If that be so we cannot help it. If there have been many sales for making wells and pumps in Brooklyn, I can' only say that *92 there have been many wrongs, and we have no choice but to redress such injuries when they are judicially brought be fore us.
New trial denied.

 See Doe, ex dem. Lemon, v. Chunn, (1 Blackf. Rep. 336 ;) as to which, how» ever, quera.

 See further, as to the meaning of the word “ tax,” The Overseers &c. of Amenia v. Overseers &c. of Stanford, (6 John. Sep. 92.)

 See Cowen & Hill’s Notes to Phil. Ev. 1289 et seq.; also per Cowen, J. in Waldron v. M’Comb, (1 Hill, 111, 114, 115;) per Bronson, J. in Bloom v. Burdick, (id. 130, 141, 2.)