Present: All the Justices

DON SCOTT, IN HIS OFFICIAL
 CAPACITY, ET AL.
                                                    OPINION BY
                                            JUSTICE D. ARTHUR KELSEY
v.  Record No. 260127                              MAY 8, 2026

RYAN T. MCDOUGLE, VIRGINIA
 STATE SENATOR, ET AL.


FROM THE CIRCUIT COURT OF TAZEWELL COUNTY

On March 6, 2026, the General Assembly of Virginia submitted to Virginia voters a

proposed constitutional amendment that authorizes partisan gerrymandering of congressional

districts in the Commonwealth.  We hold that the legislative process employed to advance this

proposal violated Article XII, Section 1 of the Constitution of Virginia.  This constitutional

violation incurably taints the resulting referendum vote and nullifies its legal efficacy.[1]


I.

This case comes to us with a historical background.  It does not determine the outcome of

the legal disputes presently before the Court, which are entirely procedural — but it does explain

the context in which these disputes have arisen.

From Madison's era[2] to the present, political parties of every stripe have offered if-by-

whiskey arguments supporting partisan gerrymandering.  Since that time until today, these

arguments have been criticized by thoughtful jurists and legal scholars.  "[P]artisan

gerrymanders," Justice Kagan has observed, "deprive[] citizens of the most fundamental of their

---

[1] For the sake of simplicity, we will collectively refer to the appellants as the
"Commonwealth" and the appellees as the "Claimants."

[2] *See* Pauline Maier, Ratification: The People Debate the Constitution, 1787-1788, at 440-
52 (2010).  *See generally Madison's Election to the First Federal Congress, October 1788-
February 1789*, National Archives: Founders Online, https://perma.cc/2GVH-HXN5.

constitutional rights:  the rights to participate equally in the political process, to join with others to advance political beliefs, and to choose their political representatives."  *Rucho v. Common Cause*, 588 U.S. 684, 721-22 (2019) (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., dissenting).

Echoing Justice Kagan's warnings, Professor A.E. Dick Howard advocated that Virginia should amend its Constitution to discourage, if not outright prohibit, partisan gerrymandering by the legislature.  *See generally* A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971: An Interview with A.E. Dick Howard*, 129 Va. Mag. Hist. & Biography 347, 365-66 (2021).  He trenchantly argued that partisan gerrymandering "undermines democracy itself." A.E. Dick Howard & Rebecca Green, *A Chance To End Gerrymandering in Virginia*, Virginian-Pilot, Dec. 9, 2018, at 19A.[3]  "Many people inveigh against partisan gerrymandering," he observed while advocating for the constitutional amendment to establish Virginia's redistricting commission, but "we in Virginia are about to do something about it."  A.E. Dick Howard, *Redistricting Commission Amendment Is a Landmark, But Work Remains To Put It in the Virginia Constitution*, Richmond Times-Dispatch, Mar. 19, 2019, at 11A.

A year after that optimistic prediction, Virginians voted by a wide margin to reform the redistricting process in the Commonwealth in an effort to end partisan gerrymandering.[4]  They

---

[3] These views are widely shared by prominent scholars, historians, and political scientists.  *See, e.g.*, Brent Tarter, Gerrymanders: How Redistricting Has Protected Slavery, White Supremacy, and Partisan Minorities in Virginia 1 (2019); Samuel S.-H. Wang, *Three Tests for Practical Evaluation of Partisan Gerrymandering*, 68 Stan. L. Rev. 1263, 1272 (2016); Charles Backstrom, Leonard Robins, & Scott Eller, *Establishing a Statewide Electoral Effects Baseline*, *in* Political Gerrymandering and the Courts 145, 148 (Bernard Grofman ed., 1990).

[4] *See also* Henry L. Chambers, Jr., *Readying Virginia for Redistricting After a Decade of Election Law Upheaval*, 55 U. Rich. L. Rev. 227, 273 (2020) ("The [Virginia Redistricting Commission] is an attempt to address partisan gerrymandering and is consistent with the Supreme Court's invitation for states to do so in *Rucho v. Common Cause*.").

adopted Article II, Section 6-A of the Constitution of Virginia to create the Virginia Redistricting Commission. Under the 2020 amendment, if this bipartisan commission could not reach a consensus, the responsibility to achieve the amendment's ultimate goal — ridding political partisanship as much as possible from the redistricting task — would become the constitutional responsibility of the Supreme Court of Virginia.

In 2021, partisan disputes in the Virginia Redistricting Commission deadlocked the 16-member commission. When the task fell to us pursuant to Article II, Section 6-A, we unanimously ordered that the prior district maps be replaced with wholly new maps that commentators across a wide spectrum of political views later deemed to be free of partisan bias.[5] We understood then, as we do today, that "[n]o tenet of free government is more fundamental than fairness in voting and representation." Howard & Green, *supra*, at 19A. This "enduring principle," *id.*, served as the anchoring ideal of Article II, Section 6-A of the Constitution of Virginia and the ultimate goal of our constitutionally assigned redistricting task.

On October 31, 2025, during a disputed 2024 Special Session,[6] the General Assembly approved by a party-line vote a proposed amendment to the Constitution of Virginia that would

---

[5] *See, e.g.*, A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political Community*, 37 J.L. & Pol. 99, 146-47 (2022) ("The court set about its task with care and with results that, whatever critics might have expected, were a vast improvement on the old ways of doing redistricting."); *Redistricting Report Card*, Princeton Gerrymandering Project, https://perma.cc/C6SS-27YP (giving Virginia an overall "A" grade for its 2021 redistricting maps for the U.S. House, Virginia House of Delegates, and Virginia Senate and stating that the 2021 maps provide no partisan advantage); Deb Wake & Liz White, *A Frustrating, Complicated Process — That Worked*, Richmond Times-Dispatch, Jan. 12, 2022, at 17A ("Virginia's new districts have been lauded by a long list of nonpartisan analysts . . . that said Virginia's new districts are among the fairest in America.").

[6] Two procedural aspects of the special session are challenged in this case. First, the General Assembly in 2024 applied to the Governor for a special legislative session. *See* Va. Const. art. IV, § 6. The application stated that the special session would consider only "such matters as are provided for in the procedural resolution" for "such Special Session." H. J. Res. 428, Va. Gen. Assem. (Reg. Sess. 2024). The procedural resolution did not authorize the General

temporarily suspend Article II, Section 6-A. In its place, the proposed amendment authorizes the General Assembly to redraw congressional districts outside of the regular decennial-census redistricting as a response to other states that also redistrict outside of decennial-census redistricting or court-ordered redistricting. The proposed amendment would authorize such redistricting to take effect for the upcoming November 2026 congressional elections.

During the 2026 Regular Session that began in January, the General Assembly again voted by a party-line vote to approve the proposed amendment. In February 2026, the General Assembly enacted and published a new map for Virginia's 11 congressional districts contingent upon approval of the proposed constitutional amendment by a majority of the voters and upon certification of such results. These new districts replace the existing nonpartisan map (representing districts split 6-5 between the two major political parties) with a highly partisan gerrymandered map (representing expected districts divided 10-1 between the two major political parties).[7]

_____

Assembly to propose constitutional amendments and required "unanimous consent" to consider matters not listed in the procedural resolution. H. J. Res. 6001, Va. Gen. Assem. (Spec. Sess. I 2024). The General Assembly later, on a party-line vote, expanded the scope of the Special Session to authorize legislative proposals to amend the Constitution of Virginia.

Second, the 2024 Special Session overlapped the 2025 Regular Session, which began in January 2025. This parallel-sessions anomaly raises serious issues. *See generally* Thomas Jefferson, A Manual of Parliamentary Practice 174-75 (1801); Mason's Manual of Legislative Procedure § 781(8), at 556 (2010 ed.); Manual of the Senate General Assembly of Virginia R. 56, at 136 (2024-2025 ed.); H. Res. 10, Va. Gen. Assem. (Reg. Sess. 2024); 5 Asher C. Hinds, Hinds' Precedents of the House of Representatives of the United States § 6690, at 857 (1907); 8 Clarence Cannon, Cannon's Precedents of the House of Representatives of the United States § 3375, at 823 (1935); 1 Lewis Deschler, Deschler's Precedents of the United States House of Representatives 13 (1976). Given our holding in this case, we need not resolve the parties' disputes on these two issues.

[7] *See* Richmond Times-Dispatch, *Virginia Democrats Make Comments on Redistricting*, at 0:42 to 1:47 (YouTube, Feb. 5, 2026), https://www.youtube.com/watch?v=G67DQWh79qQ; Senate of Virginia, *Senate Chamber on 2026-02-10*, at 1:57:29 to 1:57:54 (YouTube, Feb. 10, 2026), https://www.youtube.com/live/Ft9PWZd2rm8?si=JrJyd7s0ndtlHIVR&t=7049.

Under the proposed new map, approximately 47% of Virginians that voted for representatives of one of the major political parties in the last congressional election would now be represented by 9% of Virginia's delegation to the U.S. House of Representatives — while the approximately 51% of Virginians that voted for the other major political party would now be represented by 91% of Virginia's congressional delegation.[8]

The General Assembly first submitted the proposed constitutional amendment to Virginia voters on March 6, 2026 — the first day of early voting. The submission was accompanied by a ballot asking voters to answer "yes" or "no" to the question whether they wanted to "restore fairness" in the upcoming congressional elections. *See* 2026 Acts ch. 6, at sched. § 2. Voting started on March 6 and ended on April 21. Of the total number of all votes, approximately 45% were cast during the early voting period and approximately 55% were cast on the final day of the election.[9]

The Virginia Department of Elections reported on April 30 that 1,604,276 Virginians had cast "yes" votes in response to the "restore fairness" ballot question[10] and 1,499,393 Virginians had cast "no" votes.[11] Approximately 3.38% of the total votes separated the number of "yes" votes and "no" votes, and thus, the majority will of the people was secured by "yes" voters representing 1.69% of the total votes cast.

---

[8] *See generally 2024 November General*, Virginia Dep't of Elections (Mar. 5, 2025), https://perma.cc/7GRF-B44J?type=image (reporting the official results for the 2024 congressional election).

[9] *2026 April 21 Special*, Virginia Dep't of Elections (Apr. 30, 2026), https://perma.cc/ZKT7-YPBC (recording unofficial results by vote method).

[10] *See Proposed Amendment for April 2026 Special Election*, Virginia Dep't of Elections, https://perma.cc/G2LC-S3HW; *see also* 2026 Acts ch. 6, at sched. § 2.

[11] *2026 April 21 Special*, *supra* note 9 (recording the unofficial results demonstrating the percentage of votes for each side and the total number of votes).

II.

A.

In a constitutional republic, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Chief Justice Marshall learned this truth two decades earlier from his former law professor, another Virginian, George Wythe. Sitting in our seat of judgment in 1782, Judge Wythe laid down the two cornerstones of judicial review: the "duty" to declare the constitutional boundaries of political power and the courage to "fearlessly" protect them. *See Commonwealth v. Caton*, 8 Va. (4 Call) 5, 8 (1782). His admonition was timeless:

> [I]f the whole legislature, an event to be deprecated, should attempt to overleap the bounds, prescribed to them by the people, I, in administering the public justice of the country, will meet the united powers, at my seat in this tribunal; and, pointing to the constitution, will say, to them, here is the limit of your authority; and, hither, shall you go, but no further.

*Id.*

Consistent with this Virginia tradition, "[t]he judiciary department has the power, and it is its duty, to pass upon the validity of a constitutional enactment when put in force" by legally questionable means. *Scott v. James*, 114 Va. 297, 304 (1912). A constitution by its very nature "declare[s] under what circumstances, and in what manner it shall be amended," and it is "the supreme law of the land, to which all persons, rulers, as well as citizens, must bow in obedience." 3 Joseph Story, Commentaries on the Constitution of the United States § 1609, at 473 (1833). It follows that the judiciary has the ultimate "authority to determine the validity of the proposal, submission, or ratification of constitutional amendments." *Harrison v. Day*, 201 Va. 386, 393 (1959) (citation omitted). "Where restrictions are imposed in the Constitution by

6

express language or necessary implication upon the power of the General Assembly, the restrictions may not be ignored." *Carlisle v. Hassan*, 199 Va. 771, 776 (1958).

B.

It is fair to ask whether we could have or should have reviewed the constitutionality of the proposed amendment prior to it being presented to the voters. But it is not a question the Commonwealth should ask. Throughout this litigation, the Commonwealth has insisted that we cannot lawfully decide this case prior to the referendum. In its motion for a stay in this case, the Commonwealth argued that longstanding Virginia precedent, *Scott v. James*, was "virtually indistinguishable" from this case and that it clearly held that "courts *cannot interfere to stop any of the proceedings* while this permanent law is in the *process of being made*," and "[o]nly '*upon the completion of the proceedings*, [if] the validity of the amendment is assailed[] on the ground that the several provisions of the Constitution have not been complied with, *then* the courts can pass upon the validity of the amendment.'" Emergency Mot. to Stay at 11-12 (emphases and alterations in original) (quoting *Scott*, 114 Va. at 304).[12] The Commonwealth concluded that

_____

[12] *See also* Mot. for Admin. Stay & Vacatur at 11 ("The Supreme Court of Virginia has especially cautioned that courts may not 'arrest or interfere with the process of legislation' or enjoin the holding of an election while the amendment process is underway." (quoting *Scott*, 114 Va. at 298)); *id.* at 12 ("[J]ust as a court could not enjoin the General Assembly's transmission of a bill to the Governor for her veto or signature, a judicial injunction of the proceedings necessary to enact a constitutional amendment 'would manifestly be an unwarranted interference by the courts with the constitutional processes of the legislative department.' So, too, here." (quoting *Scott*, 114 Va. at 304)); *id.* at 14 ("[T]he underlying legal questions about the process and the ballot language can be adjudicated after the election, but they cannot be used as a vehicle to enjoin the election from taking place."); R. at 1701-02 (asserting that "[w]hat *Scott v. James* says is that you cannot interfere in the process of legislation while it is being made, and the constitutional amendment process is still ongoing" and that the "time to challenge the constitutionality . . . of an amendment" is established by *Scott* to be "after it has been adopted by the people"); *id.* at 1705-06 ("What we are saying is that the time to challenge the amendment is when it becomes law . . . . That is precisely what *Scott v. James* stands for."); *id.* at 1769-70 (arguing that *Scott v. James* counsels that a challenge to a constitutional amendment "is not justiciable until the people voted up or down" and that "a justiciable controversy, one that is ripe,

7

"[t]he lesson is clear:  Courts may not preemptively invalidate a proposed constitutional amendment before it has been passed by the voters."  *Id.* at 12 (citing *Scott*, 114 Va. at 304); *see also id.* at 14-15 ("*Scott* makes clear that the 'process' of amending the Constitution is not complete until the *voters* approve or reject the amendment." (emphasis in original) (quoting *Scott*, 114 Va. at 304)).

Having successfully insisted (over the objection of the Claimants)[13] that we postpone judicial review of the constitutional amendment until after the election process, it might be tempting for the Commonwealth to think that the final vote implicitly stacks the deck in its favor — perhaps enough so that the exercise of any judicial review could be viewed as an ultra vires effort to overturn the will of the people.  If this supposition were true — that *Scott* forbids pre-election challenges and that "the will of the people" forbids post-election challenges — then judicial review of allegedly unconstitutional procedures used to adopt a constitutional amendment would not exist in the Commonwealth of Virginia.[14]

---

it won't exist until that legislative process . . . is complete, which is the time when it's voted up or down"); *id.* at 1810 (arguing that *Scott v. James* "explicitly" states that a court cannot "opine on a legislative resolution that is not yet law" and that "the final endpoint of that constitutional amendment process is the vote"); *id.* at 2070 (arguing "under *Scott v. James*, that the time for the Court's consideration of these constitutional issues is at the time the subject constitutional amendment is voted favorably upon and into existence by the voters").

[13] The Claimants asserted in a companion case from the same circuit court, *Koski v. Republican Nat'l Comm.* (Record No. 260169), that *Scott* could be distinguished and that we should issue our ruling before the parties and the citizenry engaged in the time, expense, and effort associated with a statewide referendum vote.  *See* Resp. to Emergency Mot. to Stay (260169) at 25, 28-29.  Given the "sui generis" nature of that case, *see Koski v. Republican Nat'l Comm.*, 305 Va. ___, ___ n.3, 926 S.E.2d 289, 291 n.3 (2026) (per curiam), we ruled in favor of the Commonwealth because *Scott* was not distinguishable.

[14] We respect and accept the representation of the Commonwealth's counsel that no such assertion can be made.  At oral argument in this case, the Court asked the Commonwealth's counsel:  "I don't understand that as a legal argument given that you asked us to invoke our, ironically enough named, *Scott* decision from over 100 years ago that specifically says you don't deal with any potential procedural irregularities before the people have voted.  So saying that the people have voted yes after having said you don't even look as to whether there is any procedural

On the issues before us in this case, we hold that the ultimate vote margin plays no role in the analytics of our judicial review of the constitutionality of the pre-election constitutional-amendment process. Neither a high margin of success nor a single-digit margin, *supra* at 5, logically or legally matters. As we earlier explained:

> It cannot be overstated that *Scott* focused only on the timing of the exercise of judicial injunctive remedies — not on a court's constitutional power of judicial review. To be sure, *Scott* emphasized that "[t]he judiciary department has the power, and it is its duty, to pass upon the validity of a constitutional enactment when put in force, as well as upon the validity of an act of the legislature regularly passed and put in effect." If the electorate rejects the proposed amendment, any pending legal proceedings will be dismissed as moot. *If the electorate approves the proposed amendment, we then must exercise our constitutional duty to review lower courts' declaratory judgments before us on appeal and address de novo what equitable remedies, if any, are appropriate.*

*Koski v. Republican Nat'l Comm.*, 305 Va. ___, ___, 926 S.E.2d 289, 292 (2026) (per curiam) (emphasis added) (footnote and citations omitted).

C.

Article XII, Section 1 of the Constitution of Virginia mandates a detailed process governing the lawful adoption of constitutional amendments. These procedural requirements may seem laborious to some, perhaps even painstakingly so. The ambition of a constitution, James Madison said, is to create "a Government for perpetuity" grounded by "permanent principles and not on those of a temporary nature." Debates of the Virginia Convention (June

---

irregularity until after the people have voted doesn't add anything to the equation, does it?" Oral Argument Audio at 3:49 to 4:16. Counsel replied: "No. And to be perfectly clear, we are not arguing that this Court lacks jurisdiction to review whether the constitutional requirements of Article XII have been complied with. It does. Instead, I'm saying that on the merits this Court should not accept the challengers' arguments." *Id.* at 4:17 to 4:31. The Court again asked: "But the fact that there is a yes vote doesn't tell us anything about those merits?" *Id.* at 4:32 to 4:35. Counsel correctly answered: "No. It does not." *Id.* at 4:35 to 4:36.

12, 1788) (remarks of James Madison), *reprinted in* 10 The Documentary History of the Ratification of the Constitution 1184, 1206 (John P. Kaminski & Gaspare J. Saladino eds., 1993). For this reason, amending the Constitution "necessitate[s] compliance with the requirements of a deliberately lengthy, precise, and balanced procedure." *Coleman v. Pross*, 219 Va. 143, 153 (1978). "[S]trict compliance with these mandatory provisions is required in order that all proposed constitutional amendments shall receive the deliberate consideration and careful scrutiny that they deserve." *Id.* at 154.

The opening sentence of Article XII, Section 1 states the first requirement for the non-convention method of amending the Constitution of Virginia. In pertinent part, it provides:

> Any amendment or amendments to this Constitution may be proposed in the Senate or House of Delegates, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be . . . referred to the General Assembly at its first regular session held after the next general election of members of the House of Delegates.

Under this provision, the General Assembly can propose amendments but cannot adopt them. The inverse is also true. Virginia voters can adopt or reject amendments but cannot propose them. This constitutional-amendment process of dividing power between the people and their politicians has withstood the test of time "for more than one hundred years." *Coleman*, 219 Va. at 153. And it has remained so for the half-century since *Coleman*.

To guard against hasty changes to the Commonwealth's organic law, Article XII, Section 1 also slow-walks the constitutional-amendment process. The General Assembly must twice vote in favor of a proposed amendment at two separate legislative sessions with an intervening election of the House of Delegates. This gives voters two opportunities — one indirect, the other direct — to voice their views on the proposed amendment. The first is during the intervening-election period between the two legislative sessions. Voters can support or defeat

10

candidates for the House of Delegates who either endorse or oppose the proposed amendment.[15]

If the General Assembly votes against it at the next legislative session, the process ends there. If the General Assembly votes in favor of the proposal, voters get a second direct opportunity to vote the proposed amendment up or down at the ballot box. The efficacy of the second popular vote depends in part upon the reliability of the first.

"The reasoning behind this," Delegate Slaughter stated in 1969 during the General Assembly's debates over the later 1971 amendments to the Virginia Constitution, "is that Constitutions should not be changed lightly."[16] *See* Debates of the House of Delegates, *supra*

---

[15] *See* John J. Dinan, The American State Constitutional Tradition 43 (2006) (recounting the historical purpose of the intervening-election requirement as "permitt[ing] the people to register their approval of amendments indirectly, by giving them a chance in an intervening election to unseat legislators who had supported an unpopular amendment"); Walter Fairleigh Dodd, The Revision and Amendment of State Constitutions 120-23 (1910) (recognizing that most states during the nineteenth-century had adopted an intervening-election requirement for constitutional amendments); G. Alan Tarr, *Popular Constitutionalism in State and Nation*, 77 Ohio St. L.J. 237, 270-71 (2016) (stating that "[m]any states initially required passage of proposed amendments in two successive legislative sessions with an intervening election, so that the people could by their votes express their views on proposed amendments, and fifteen states retain some form of that requirement today" and that "the two-session requirement does give the people a chance to render a verdict by unseating legislators").

[16] At oral argument, the Commonwealth attempted to sideline these statements by arguing that they were made in a different context. *See* Oral Argument Audio at 15:05 to 16:41. We disagree. The purpose of the intervening-election requirement in Article XII, Section 1 was raised during the debates as support for rejecting an amendment to Article XII, Section 2 that would have allowed a constitutional convention to be called by a simple majority of the General Assembly rather than a two-thirds vote. Delegate Slaughter successfully argued that because the convention method is already "a quicker method and faster," a two-thirds vote should remain to provide "an overriding necessity to act more quickly, and possibly hastily." Proceedings and Debates of the House of Delegates Pertaining to the Amendment of the Constitution 498 (Extra. Sess. 1969) [hereinafter Debates of the House of Delegates]. Delegate Slaughter pointed to the intervening-election requirement in Article XII, Section 1 as an analogous requirement in the non-convention amendment method to prevent the Constitution from being "changed lightly." *Id.* The acknowledgment that the convention method was "a quicker method and faster," *id.*, than the non-convention method also confirms the intention for the latter to be a slower, more deliberative process. For similar reasons, the replacement of the 90-day pre-publication period with a 90-day delay before submission to the people in order to inform the people of the substance of the amendment does not refute the stated purpose for the intervening-election

note 16, at 498. "Not only would there be an intervening House of Delegates election where you might be able to get the sentiment of the people on an amendment you had acted upon previously, but upon reflection the General Assembly might decide not to submit the amendment." *Id.*[17]

In this case, voting in the general election for the House of Delegates began on September 19, 2025, and ended on Election Day, November 4, 2025. The General Assembly voted for the first time to propose the constitutional amendment to the electorate on October 31, 2025. By that date, over 1.3 million votes had been cast in the general election, which was approximately 40% of the total vote for that election cycle.[18]

The Commonwealth sees nothing wrong with this sequencing because, under its interpretation, the term "general election" in Article XII, Section 1 only means the last day of the election, November 4, otherwise known as "Election Day." Because Election Day was four days after the October 31 vote to propose the constitutional amendment to Virginia voters, the Commonwealth concludes that there was an intervening election between the 2024 Special

_____

requirement — promoting deliberation so that the Constitution would not be "changed lightly," *id.*

[17] This reasoning is in accord with those states that decided to keep their intervening-election requirements for amending their state constitutions when many states eliminated the requirement in the latter half of the 1800s in order to allow for faster amendments to the constitution. *See* Dinan, *supra* note 15, at 43-44 (recognizing that "some delegates were reluctant to dispense with the consecutive-legislatures requirement, because this provision was seen as promoting deliberation in the amending process" and noting that "some states therefore chose to retain their consecutive-legislatures requirements").

[18] *See 2025 November General*, Virginia Dep't of Elections (Dec. 1, 2025), https://perma.cc/P4GF-DEAS?type=image (reporting the total votes by method, including early voting, mailed absentee voting, and Election Day voting); *Early Voting in Virginia 2025 November General*, VPAP, https://perma.cc/QPF9-N8H8 (reporting the cumulative number of ballots cast by each day of the election period).

Session (which included the first legislative vote for the constitutional amendment) and the later 2026 Regular Session (which included the second legislative vote).

In other words, under the Commonwealth's view, the four-day period (which included a weekend) was the "intervening" period during which Virginia voters could find out what the proposed amendment actually said, whether their preferred candidate supported or opposed it, and whether they wanted to use their vote to express a view on the subject. This view appears to be wholly unprecedented in Virginia's history. "In the half century since adoption of Virginia's 1971 constitution, the General Assembly has approved 63 amendments for placement on the ballot and voters have ratified 54 of them." John Dinan, *Virginia's Constitution: An Influential and Resurgent Declaration of Rights*, State Court Report (June 3, 2025), https://perma.cc/CC68-Y9XU. Of these 63 prior proposals, the Commonwealth has identified none in which the General Assembly passed a proposed amendment after voting in the general election had already begun.

As for the 1.3 million or so Virginians in this case who had voted before October 31, the Commonwealth concedes that the "clear purpose" of the intervening-election requirement was to provide them with the constitutionally protected "*opportunity* to elect the House of Delegates that will participate in the second legislative vote on the proposed amendment." Appellants' Br. (Commonwealth) at 14 (emphasis in original). But early voters squandered that opportunity, the Commonwealth contends, by accepting the Commonwealth's invitation to cast their votes during the 42 days of voting prior to the four-day period between October 31 (the day the legislature voted to amend the Constitution) and November 4 (the last day of voting in the election). Under this thesis, early Virginia voters unknowingly forfeited their constitutionally protected opportunity to vote for or against delegates who favor or disfavor amending the Constitution by

13

not anticipating a legislative vote on a constitutional amendment four days before the last day of voting. To be sure, under the Commonwealth's logic, the legislative vote could just as well have been one day before. *See* Oral Argument Audio at 25:32 to 25:44 (arguing that "Election Day *is the election*. So anything that gets passed must be passed before Election Day" (emphasis added)).

The Commonwealth's position finds no support from the text of Article XII, Section 1 or the historical meaning of the term "election." The predecessor of Article XII, Section 1 first appeared in the 1870 Constitution of Virginia. That constitution set forth a 3-month publication requirement prior to the intervening election that also used the expression "time of making such choice" to describe the "next general election" required by the provision to occur between the first and second legislative votes proposing a constitutional amendment. *See* Va. Const. art. XII (1870). The 1902 and 1928 Constitutions replaced "time of making such choice" in the publication clause with the "time of such election." *See* Va. Const. art. XV, § 196 (1902); Va. Const. art. XV, § 196 (1928). The 1971 Constitution removed the pre-publication requirement,[19] thus leaving only the phrase "next general election" to reference the intervening-election requirement. *See* Va. Const. art. XII, § 1. Not one of these expressions since the constitutional-amendment provision was first included in 1870 categorically limited the definition of "election" to a single day.

---

[19] *See* Debates of the House of Delegates, *supra* note 16, at 496 ("We struck out any reference to publication because of some question about what sort of publication might be required."); 2 A.E. Dick Howard, Commentaries on the Constitution of Virginia 1175 (1974) ("When at the 1969 session the Assembly dropped the publication requirement and instead inserted into section I the ninety-day delay, it avoided what otherwise could have been a troublesome problem of what the law means by 'publication.'").

Before evaluating the exegesis of the term "election" by legal scholars and courts, it is worth observing that the Commonwealth's view would be unrecognizable to the average citizen. That perspective should not be scorned but praised. As we have repeatedly said, "the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise," and thus, "we are guided by the principle that *the Constitution was written to be understood by the voters*." *Old Dominion Comm. for Fair Util. Rates v. State Corp. Comm'n*, 294 Va. 168, 185 (2017) (emphasis added) (first quoting *Howell v. McAuliffe*, 292 Va. 320, 368 (2016); then quoting *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008)).

With that perspective, imagine one of the over one million Virginians who had voted in person before Election Day in 2025 walking into a polling place. The voter says to the officer of election, "I am here to vote in the election." The officer of election responds, "we are not conducting an election here." "But that's why I am here," the voter replies. "Maybe so, but let me explain," the officer of election insists, "you can vote in the election, but we are not conducting an election today. Elections are only conducted on Election Day."

Legal scholars and courts would have the same bewildered reaction as the hypothetical average citizen. The definition of "election" has always broadly denoted the "act of choosing." 1 Samuel Johnson, Dictionary of the English Language 697 (1755) (altering archaic spelling); 1 Noah Webster, An American Dictionary of the English Language 646 (1828).[20] Most, if not

---

[20] *See also* Nathan Bailey, An Universal Etymological English Dictionary 297 (7th ed. 1735) (defining election as "Choosing or Choice" (altering archaic spelling)); 1 John Ash, The New and Complete Dictionary of the English Language 322 (1775) (defining election as "[t]he act of choosing"); William Perry, Royal Standard English Dictionary 166 (1st Am. ed. 1788) (defining election as "act of choosing"); 1 Thomas Sheridan, A Complete Dictionary of the English Language 439 (3d ed. 1790) (defining election as "[t]he act of choosing" (altering archaic spelling)); John Walker, A Critical Pronouncing Dictionary and Expositor of the English

all, law lexicons treat this popular meaning as the technical definition of the word. *See* Black's

Law Dictionary 653 (12th ed. 2024) (defining "election" as "[t]he process of selecting");[21] 1

John Bouvier, A Law Dictionary 460 (1864) ("This term, in its most usual acceptation, signifies

the choice which several persons collectively make . . . ."); J.J.S. Wharton, Law Lexicon 263

(Edward Hopper ed., 2d Am. ed. 1860) (defining election as "the act of selecting").[22]

---

Language 230 (1791) (defining election as "[t]he act of choosing" (altering archaic spelling));
James Barclay, A Complete and Universal Dictionary of the English Language 310 (1848)
(defining election as "the act of choosing"); Joseph E. Worcester, A Dictionary of the English
Language 469 (1860) (defining election as "[t]he act of electing or choosing"); James Stormonth,
Etymology and Pronouncing Dictionary of the English Language 173 (6th rev. ed. 1881)
(defining election as "the choice or selection" or "power of choosing"); 2 Funk & Wagnalls New
Standard Dictionary of the English Language 798 (Isaac K. Funk ed., 1900) (defining election as
"[t]he act or proceeding of selecting"); 3 William Dwight Whitney, The Century Dictionary and
Cyclopedia 1866 (1900) (defining election as "[t]he act or process of choosing"); Webster's
Third New International Dictionary 730 (2002) (defining election as "the act or process of
electing" and "the act or process of choosing").

[21] Black's Law Dictionary 412 (1st ed. 1891) (defining election as "[t]he act of choosing
or selecting"); Black's Law Dictionary 415 (2d ed. 1910) (same); Black's Law Dictionary 646
(3d ed. 1944) (same); Black's Law Dictionary 608 (4th ed. 1951) (defining election as "[t]he act
of choosing or selecting" and noting that "the term in ordinary usage" means "the expression by
vote of the will of the people"); Black's Law Dictionary 464-65 (5th ed. 1979) (same); Black's
Law Dictionary 517-18 (6th ed. 1990) (defining election as "[t]he act of choosing or selecting"
or "[a]n expression of choice by the voters of a public body politic, or as a means by which a
choice is made by the electors"); Black's Law Dictionary 536 (7th ed. 1999) (defining election as
"[t]he process of selecting"); Black's Law Dictionary 557 (8th ed. 2004) (same); Black's Law
Dictionary 595 (9th ed. 2009) (same); Black's Law Dictionary 631 (10th ed. 2014) (same);
Black's Law Dictionary 654 (11th ed. 2019) (same).

[22] *See also* Arthur Male, A Treatise on the Law and Practice of Elections 100 (1818)
("'Election' is 'a choice by the major part of those who have a right to choose' . . . .");
1 Benjamin Vaughan Abbott, Dictionary of Terms and Phrases Used in American or English
Jurisprudence 418 (1879) (defining election as "choosing; selecting" and recognizing that, in
both "England to a considerable extent" and "more frequently in the United States," "[t]hese
words have been long and extensively in use to signify the right to choose, or act of choosing");
1 Stewart Rapalje & Robert L. Lawrence, A Dictionary of American and English Law 436 (1883)
(defining election as the "operation of choosing"); William C. Anderson, A Dictionary of Law
394 (1889) (defining election as "[a] choosing, or selecting"); 10 American and English
Encyclopedia of Law 562 (2d ed. 1899) ("In its Broadest Sense the term 'election' signifies any
choice . . . .").

This lexical sense of the noun "election" must be distinguished from the noun phrase "election day." The near universal definition of "election day" is a "single day established by law for voters to cast ballots by presenting themselves in person at a voting precinct." Black's Law Dictionary 654 (12th ed. 2024). Giving both terms their intended meanings, Black's Law Dictionary correctly observes, "[i]n jurisdictions that allow early in-person voting, election day is normally the *last day* on which voters may cast a ballot in a given *election*." *Id.* (emphases added); *see also id.* at 1895 (defining "absentee voting" as "participation in an election by a qualified voter").

The semantic differences between these terms have a rich provenance. Beginning in colonial days, it was common in Virginia and other colonies for elections to last for days as election officials (usually sheriffs) canvassed the countryside to collect votes during elections. *See* 1 Charles Seymour & Donald Paige Frary, How the World Votes 208 (1918).

> In the royal colonies alone was the English system of taking the poll adopted . . . . that called for an oral vote or a show of hands to decide the result. If any candidate or voter demanded it, a poll must be taken, which might last for days. So great was the solicitude for the voter's convenience, that in Virginia the sheriff appeared at the planter's gate and wrote down his vote, without calling him from his plow or his tobacco shed.

*Id.*[23] Following the English tradition, voting in an early American election "continued until all the electors had been heard from, or until the closing of the polls had been thrice proclaimed from the court house door." *Id.* at 209. In jurisdictions following this tradition,

---

[23] *See also* Cortlandt F. Bishop, History of Elections in the American Colonies 159-60 (1893) ("In regard to adjourning or closing the poll, . . . . the returning officer must proceed from day to day, and from time to time, until all the freeholders present were polled. . . . On the western side of the Atlantic we find that it was customary in early times for the sheriffs of Virginia to go from one plantation to another and collect the votes of the inhabitants."); Joseph P. Harris, Election Administration in the United States 13, 15 (1934) ("[T]here were elections which lasted for several days, contrary to the fixed custom which has since arisen for the election

17

> [t]he poll could not be concluded until all present had voted, or until after proclamation had been made three times from the court house door, and no more freeholders appeared. . . . In case more freeholders appeared on the first day of an election than could be polled before sunset, and if the candidates or their agents so requested, the sheriff could adjourn the poll to the following day.

Bishop, *supra* note 23, at 161-62.

In other American colonies, eligible voters sent their votes by proxy to prevent the danger and damage that might result from them leaving their land to vote in the election or to save them "the inconvenience and trouble required by a journey to the capital town." *Id.* at 127, 129; *see also* Harris, *supra* note 23, at 13. These proxy votes, the precursor to today's absentee mail ballots, were in writing and sealed, and deputies selected by the local voters would take them to the court of election. *See* Bishop, *supra* note 23, at 127-39.

In the mid-1800s, it was recognized during congressional debates that the vote in Virginia occurred by voice vote, "and it frequently happened that all the votes were not polled in one day" — including at the most "recent election, at Richmond and at other places." Cong. Globe, 28th Cong., 2d Sess. 15 (1844). This occurred "in a State circumstanced as Virginia was — mountainous and intersected by large streams of water — at times of high water, and of inclement weather," because "voters were frequently prevented from attending the polls in one day." *Id.*

While the events of the mid-1800s led to laws establishing a single day for casting and receiving votes, *see generally Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1172-74

---

to be completed within a single day. . . . There was considerable variation in the conduct of elections, however, and it is recorded that in Virginia it was common for the sheriff to take the votes at the homes of the citizens."); Michael J. Dubin, United States Congressional Elections, 1788-1997, at x (1998) ("There were also differences in the length of elections. States allowed anywhere from one to five days for elections, and Virginia held elections on a different date in each county so that even within a single district the election was held on different dates.").

(9th Cir. 2001), modern election protocols eventually cycled back to the historical practice of permitting defined time frames for casting and receiving votes in an election.[24] Despite the varying duration of the election process over time, one constant has persisted: "From time immemorial an election to public office has been in point of substance no more and no less than the expression by qualified electors of their choice of candidates." *United States v. Classic*, 313 U.S. 299, 318 (1941). When the law speaks of an "election," it "plainly refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster v. Love*, 522 U.S. 67, 71 (1997) (relying on the definition of election from Noah Webster's American Dictionary of the English Language); *see also Millsaps v. Thompson*, 259 F.3d 535, 547 (6th Cir. 2001); *Keisling*, 259 F.3d at 1175; *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775-76 (5th Cir. 2000).

The "combined actions" that define the term "election," *Foster*, 522 U.S. at 71, include citizens casting votes, from the beginning of the early-voting period until Election Day, and the officers of election receiving these votes and closing the polls on "Election Day" — which "[i]n jurisdictions permitting early in-person voting," the American Law Institute correctly explains, "is the last day on which voters may cast a ballot in that particular election," Principles of the Law of Election Administration § 101, at 2-3 (A.L.I. 2019). The definition is short and clear: "History confirms that 'election' includes both ballot casting and ballot receipt." *Republican*

---

[24] *See, e.g.*, 52 U.S.C. §§ 20301-20311 (requiring states to permit absent uniformed services voters and overseas voters to vote in federal elections by absentee ballot); Code §§ 24.2-701.1(A) (providing for in-person voting to be available on the 45th day before Election Day until the Saturday prior to Election Day), -612 (providing for the availability of absentee ballots, which can be mailed or dropped off, no later than 45 days before Election Day).

*Nat'l Comm. v. Wetzel*, 120 F.4th 200, 209 (5th Cir. 2024), *cert. granted sub nom.*, *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 355 (2025).[25]

With this definition in mind, the Commonwealth implicitly concedes that early voting is one of the combined actions of the election when it recognizes that early voting "is *casting a ballot* to be counted on Election Day." Reply Br. (Commonwealth) at 4 (emphasis added). When governing law authorizes citizens to cast ballots over a period of time (as Virginia does in its "early voting" process, Code §§ 24.2-701.1(A), -612), the durational term "election" and the determinate term "Election Day" fit together perfectly. The metes and bounds of an election begin with the point of casting votes and end with the point of receiving votes and closing the polls on the last day of the election. Election Day is the boundary marker for the last act constituting an election.

The "combined actions" definition of "election," *Foster*, 522 U.S. at 71, undermines the Commonwealth's argument that Article IV, Section 3's designation of a date certain on which the House of Delegates winners "shall be elected" should be interpolated into Article XII, Section 1's definition of the noun phrase "general election." The Commonwealth states that in Article IV, Section 3, "[t]he Constitution defines that election as occurring on 'the Tuesday succeeding the first Monday in November.'" Reply Br. (Commonwealth) at 3.[26] Article IV, Section 3, however, never uses the word "election" and makes no attempt to define that unmentioned term.

---

[25] *See also Commonwealth v. Kirk*, 43 Ky. (4 B. Mon.) 1, 2 (1843) (recognizing that "[a]n election is the voting and the taking of the votes of the citizens"); *State v. Tucker*, 54 Ala. 205, 210 (1875) ("[W]hen the legislature employ[s] the word election, they mean the act of casting and receiving the ballots, the day and time of voting."); Anderson, *supra* note 22, at 394 (defining election as "[v]oting and taking the votes of citizens").

[26] *See also* Appellants' Br. (Commonwealth) at 16; Emergency Mot. to Stay at 8, 19.

The date certain in Article IV, Section 3, when considered in the context of the provision and the verb phrase "shall be elected," describes the time of the final act in an election. In legal argot as well as common speech, a wedding can last for hours, but the bride and groom are not lawfully wed until the officiant declares them so at the end of it. Equally so here. A general election can take place over many days, but it culminates and ends on Election Day. The successful candidate "shall be" lawfully deemed "elected" no earlier than Election Day, the last day of voting in the election.

The Commonwealth's contest with this reasoning begins well but ends poorly. As the Commonwealth correctly observes, courts often employ linguistic presumptions. One presumes that the "same term" used in "separate statutes" has the "same meaning" unless context "indicates to the contrary." *Jenkins v. Mehra*, 281 Va. 37, 48 (2011) (citation omitted).[27] When applicable, this principle raises a rebuttable, not a conclusive, presumption. As Chief Justice Marshall explained: "It has been also said, that the same words have not *necessarily* the same meaning attached to them when found in different parts of the same instrument: their meaning is controlled by the context." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 19 (1831) (emphasis added).

What the Commonwealth overlooks is that an opposite presumption applies when there is a "material variation in terms." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012). "[A] material variation in terms suggests a variation in

---

[27] *See also Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 278 (2016) (applying presumption to "exactly the same word" found in different provisions of the "same" statute); *Commonwealth v. Jackson*, 276 Va. 184, 194 (2008) (applying the "same meaning" presumption to the "same term" if context does not suggest otherwise).

21

meaning." *Id.* Similar but not identical words, in similar but not identical contexts, should be presumed to refer to similar but not identical ideas.[28]

The noun phrase "general election" in Article XII, Section 1 is not the same as the verb phrase "shall be elected" in Article IV, Section 3. The former textually denotes the cumulative actions of voters casting votes and election officials receiving those votes. *Supra* at 19. The latter textually denotes a single day, Election Day, at the conclusion of which all votes cast legally declare the ultimate winner. This "material variation" connotes a "variation in meaning." Scalia & Garner, *supra*, at 170. And that variation in meaning is fully explained by the centuries-old definition of "election," which includes the act of casting votes, *supra* at 15-19, and by the contextual purpose of Article XII, Section 1, which gives Virginia voters an opportunity to choose legislators who will support or defeat the proposed amendment, *supra* at 10-12 and notes 15-17.

For these reasons, we hold that the definition of "general election" in Article XII, Section 1 describes the combined actions of voters casting ballots and officers of election receiving those votes and closing the polls on the last day of the election. The plain and ordinary meaning of the expression matches the historical definition embraced by the courts and legal scholars. Article XII, Section 1 requires an intervening "general election" after the first legislative vote in favor of a proposed amendment and prior to the second legislative vote before the General Assembly has the constitutional authority to submit the proposal to the voters. In

---

[28] *See Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011) (recognizing that when an enactment uses "specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere . . . , we must presume that the difference in the choice of language was intentional"); *Tvardek*, 291 Va. at 277 & n.6 (relying upon *Zinone* and applying the material-variation presumption).

this case, the General Assembly passed the proposed constitutional amendment for the first time well after voters had begun casting ballots during the 2025 general election.

D.

Our colleagues in dissent raise various objections to our reasoning.  Some we have already addressed, but a few deserve more specific responses.  Several of the dissent's objections were scarcely mentioned by the parties, either in briefs filed in the circuit court or on appeal, and one was not mentioned at all.  In our view, none of these objections undermine our interpretation of Article XII, Section 1.

1.

The dissent's lead argument relies on Article II, Section 4, which empowers the General Assembly to "regulate the time, place, manner, conduct, and administration" of elections and "to make any other law regulating elections not inconsistent with this Constitution."  The dissent then points to various statutory provisions sprinkled throughout Title 24.2 that they argue take precedence over our interpretation of Article XII, Section 1.

The dissent, for example, calls our attention to Code § 24.2-101's definition of "[g]eneral election."  A single sentence in the Legislators' Opening Brief on page 32 also mentions this definition.  Neither the dissent nor the Legislators' Opening Brief, however, acknowledge the statute's preamble.  It expressly states that the definitions in Code § 24.2-101 do not apply when "context requires a different meaning."  For his part, the Attorney General of Virginia — the "chief executive officer of the Department of Law," Code § 2.2-500 — does not once mention Code § 24.2-101 in any of his briefs on appeal.  Nor did his earlier "official advisory Opinion," issued on behalf of the Commonwealth, cite the statute or assert its relevance to the issue before us.  *See* 2026 Op. Atty. Gen. 26-003, 2026 Va. AG LEXIS 4 (Jan. 17, 2026).

23

At any rate, we place little or no interpretive weight on these statutory definitions given their expressly stated inapplicability when "context requires a different meaning," Code § 24.2-101. A self-limiting statutory definition cannot supersede the literal text, drafting history, historical context, and unambiguous purpose of a constitutional provision. Article II, Section 4 reinforces this truism by stating that its authorization to the General Assembly does not contemplate statutory provisions "regulating elections" in a manner that is "inconsistent with this Constitution."[29]

The same conclusion applies to the argument that the statute authorizing early voting during the 45-day period "prior to any election," Code § 24.2-701.1(A), displaces our understanding of the constitutional meaning of "general election" in Article XII, Section 1. The term "general election" in this provision first appeared in the Constitution of Virginia in 1870. The General Assembly enacted Code § 24.2-701.1(A) in 2019 — 149 years later. The inferential meaning attributed by the dissent to this modern statute is a weak reed on which to challenge the settled, historic meaning of "election" first used a century and a half earlier. *See supra* at 15-19.

The dissent seeks to bolster its position by relying on *Moore v. Pullem*, 150 Va. 174, 192 (1928). We do too but for different reasons. First, *Moore* held nearly a century ago that the then-existing law for absentee voting should be "liberally construed in favor of the absent voter," *id.* at 183, particularly in light of the "enlightened and aroused public opinion, which seeks to encourage and secure the participation of a larger number of voters in the exercise of the

---

[29] There is an additional irony in the dissent's approach. If it were true that the word "election" in every constitutional context solely meant Election Day, then Article II, Section 4's grant of "time, place, manner, conduct, and administration" authority to the General Assembly to "regulate" elections would arguably apply only to that one day and not to the numerous election activities regulated under Title 24.2 during the 45 days of early and absentee voting prior to Election Day. Our interpretation, in contrast, casts no doubt on the General Assembly's regulatory power over elections.

suffrage," *id.* at 184.  If *Moore* were written today, we are confident it would say that precluding 1.3 million early voters in the 2025 general election from having a say in an ongoing debate over a proposed constitutional amendment would require a truly illiberal construction of Virginia law.

Second, *Moore* recognized that the Constitution of Virginia can "expressly or by necessary implication" defeat any contrary interpretation of a statute governing the "right to vote." *Id.* at 192.  We certainly agree, and none of the Code provisions relied upon by the dissent can overcome the historic meaning of "general election" in Article XII, Section 1, whether that meaning is deemed to be express or necessarily implied.  The meaning of "election" is fixed as the combined actions of voters casting ballots and officers of election receiving those votes and closing the polls on the last day of the election.  The General Assembly can exercise its authority within these conceptual boundaries.  But the General Assembly cannot change by ipse dixit the definition of "general election" in Article XII, Section 1 — or any other provision of the Constitution of Virginia — simply by passing a statute declaring it to be so.

2.

The dissent next claims that our interpretation of Article XII, Section 1 would cause "our courts to sit relatively idle for more than 25% of each year." *Post* at 36.  The Commonwealth has never made this rather extreme argument in any of its 20-plus briefs and motions filed during the course of this litigation by any of the 16 attorneys (including the Attorney General of Virginia) representing the Commonwealth.  Because our colleagues in dissent sua sponte make it an issue, however, it is prudent for us to address it.

Article II, Section 9 of the Constitution of Virginia provides, in part, that "[n]o voter, during the time of holding any election at which he is entitled to vote, shall be compelled to perform military service, except in time of war or public danger, nor to attend any court as suitor,

25

juror, or witness." This provision deals with compulsion that would cause a voter to lose the opportunity to vote. Some might argue that this provision only precludes compulsion that would interfere with a voter's one-day access to the polls during the lawful period of election. Under this view, the voter could vote during the election period, and Article II, Section 9 would not be implicated. Others might argue (as the dissent speculates, *see post* at 36 note 5) that the compulsion is prohibited only on "Election Day" in accord with the legal holidays established by Code § 2.2-3300.

To us, this clever argument is a story of the tail wagging the dog that has no tail. The textual and contextual meaning of Article II, Section 9 was never addressed by the circuit court, never mentioned in any legal brief filed in this case, and not discussed during oral argument. Of the two arguable interpretations of the anti-compulsion policy embraced by Article II, Section 9, neither one contradicts our belief that "[h]istory confirms that 'election' includes both ballot casting and ballot receipt." *Supra* at 19-20 (quoting *Wetzel*, 120 F.4th at 209).

3.

The dissent goes on to suggest that our interpretation also "injects unnecessary confusion into the qualifications for state senators and delegates." *Post* at 37. Article IV, Section 4 of the Constitution of Virginia requires candidates for these offices to be "at the time of the election" at least 21 years old, a resident in the district, and a qualified voter for members of the General Assembly. We do not find it confusing. Article IV, Section 4 provides that "[a]ny person may be elected" to the Senate or the House of Delegates "who, at the time of the election, is twenty-one years of age." The phrase "at the time of the election" must be viewed in the context of what precedes it in the sentence. The phrase "may be elected" has a similar connotation to the phrase "shall be elected" in Article IV, Section 3, and likewise, "may be elected" refers only to the final

26

act of the election when a Senator or Delegate is deemed to be elected by the majority of the voters. It thus follows that "at the time of the election" means the time when a Senator or Delegate is deemed elected as the successful candidate. We see no "unnecessary confusion," *post* at 37, when the provision is viewed through this contextual lens.[30]

4.

We finally address the dissent's claim that "[b]y extending elections in the Commonwealth of Virginia beyond a single day, the majority's formulation would directly conflict with the federal mandate that elections for federal offices be held on a single day." *Post* at 39. We disagree. The United States Supreme Court has held "that if an *election* does take place, it may not be *consummated* prior to federal election day" in order to comply with federal election-day statutes. *Foster*, 522 U.S. at 72 n.4 (emphases added). Federal appellate courts reviewing challenges to laws providing for early and absentee voting have applied this holding to uphold those laws. As the Sixth Circuit has explained:

> *Foster*'s narrow holding suggests that, so long as a State *does not conclude an election prior to federal election day*, the State's law will not "actually conflict" with federal law. . . . An "election" under the federal statutes requires more than just voting, and the Early Voting Statutes do not create a regime of combined action

---

[30] We are similarly unconvinced that the context of Article VII, Section 4 supports the dissent's view that our interpretation of "election" in Article XII, Section 1 must mean a single day. The dissent posits that Article VII, Section 4 "does not state that county and city officers shall be *elected* on a specific day, as in Article IV, Sections 2 and 3; rather, it specifies that the *election* shall be held on a single day." *Post* at 35-36. The context of the constitutional provision, however, suggests otherwise. Article VII, Section 4 provides for the day when county and city officers shall be deemed elected as the successful candidates in an election. The first paragraph of Article VII, Section 4 begins with "[t]here *shall be elected* by the qualified voters of each county and city [various officers]." The second paragraph then refers back to the first paragraph when it begins with "[r]egular elections for *such officers* shall be held on Tuesday after the first Monday in November." The context of this provision suggests a similar purpose and meaning as Article IV, Section 3, *see supra* at 20-22, which does not undermine our interpretation of the meaning of election in Article XII, Section 1.

27

meant to make a final selection on any day other than federal election day.

*Millsaps*, 259 F.3d at 546-47 (emphasis added).  The Ninth Circuit similarly holds:

> The Supreme Court has provided the device for reconciling the federal election day statute and the federal absentee voting statute: *a definition of "election" that treats election day as the "consummation" of the process rather than any day during which voting takes place. . . .*  Although voting takes place, perhaps most voting, prior to election day, the election is not "consummated" before election day because voting still takes place on that day.

*Keisling*, 259 F.3d at 1176 (emphasis added).  The Fifth Circuit has come to the same conclusion.

*See Bomer*, 199 F.3d at 776 (relying on the *Foster* definition of "election" and concluding "that the Court would not alter its definition of 'election' to require that states begin their federal election on federal election day" and that "some acts associated with the election may be conducted before the federal election day without violating the federal election statutes").  No persuasive, much less binding, federal law supports the dissent's implied claim that our interpretation of Article XII, Section 1 violates the Supremacy Clause of the United States Constitution.

5.

We fully acknowledge Ralph Waldo Emerson's warning that "[a] foolish consistency is the hobgoblin of little minds."  R.W. Emerson, *Self-Reliance*, *in* Essays 43, 58 (1841).  As our dissenting colleagues suggest, it truly would be foolish for us to assign by diktat a specific, inflexible meaning to the words "elected" or "election" used in the many diverse ways they are used in common speech as well as statutes and constitutions.  We are not attempting to do so.  The antidote to Emerson's warning is Justice Scalia's reminder that "[i]n textual interpretation, context is everything, and the context of the Constitution tells us not to expect nit-picking detail."  Antonin Scalia, A Matter of Interpretation 37 (1997); *see also* Scalia & Garner, *supra*, at

28

167 ("Context is a primary determinant of meaning."). "Context also includes common sense," Justice Barrett adds, "which is another thing that 'goes without saying.'" *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring).

To us, it is common sense that the phrase "general election," as used in the context of Article XII, Section 1, includes the combined actions of citizens casting votes and election officials receiving these votes and closing the polls on the last day of the election. The purpose of Article XII, Section 1 is to give voters the opportunity to participate in the process of amending their Constitution. It truly would be a foolish consistency if we insisted (and we do not) that the historical definition of "election" applies in exactly the same way to the plethora of different legal texts ensconced in different policy contexts. The dissent does just that with its inflexible, one-size-fits-all definition of "election" as a single 24-hour period, Election Day — the last day of voting. And that inflexibility, deployed by the Commonwealth in this case, ended up denying over 1.3 million Virginians their constitutional right to have a voice in the debate over whether their Constitution should be amended — thereby eroding one of the core rights that Article XII, Section 1 was intended to safeguard.

III.

While the Commonwealth is free by its lights to do the right thing for the right reason, the Rule of Law requires that it be done the right way. Under the Constitution of Virginia, the right way "necessitate[s] compliance with the requirements of a deliberately lengthy, precise, and balanced procedure," *Coleman*, 219 Va. at 153, governing the lawful adoption of constitutional amendments. "[S]trict compliance with these mandatory provisions is required in order that all proposed constitutional amendments shall receive the deliberate consideration and careful scrutiny that they deserve." *Id.* at 154.

29

In this case, the Commonwealth submitted a proposed constitutional amendment to Virginia voters in an unprecedented manner that violated the intervening-election requirement in Article XII, Section 1 of the Constitution of Virginia.[31]  This violation irreparably undermines the integrity of the resulting referendum vote and renders it null and void.  For this reason, the congressional district maps issued by this Court in 2021 pursuant to Article II, Section 6-A of the Constitution of Virginia remain the governing maps for the upcoming 2026 congressional elections.

*Affirmed*.


CHIEF JUSTICE POWELL, with whom JUSTICE MANN and JUSTICE FULTON join, dissenting.

This Court has long recognized that our "'Constitution is certain and fixed.'"  *Staples v. Gilmer*, 183 Va 338, 350 (1944) (quoting *Vanhorne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 308 (Pa. 1795)).  "'[I]t contains the *permanent* will of the people,'" and, therefore, its meaning can only be altered by the people.  *Id.* (quoting *Vanhorne's Lessee*, 2 U.S. (2 Dall.) at 308) (emphasis added).  Notwithstanding this bedrock principle, today the majority has broadened the meaning of the word "election," as used in the Virginia Constitution, to include the early voting period.  This is in direct conflict with how both Virginia and federal law define an election.  Under the facts of this case, I believe the circuit court erred and I respectfully disagree with the

---

[31] Given our holding in this case, we need not address any of the remaining questions, including (i) the potential remedy for a failure of state and local officials to comply with former Code § 30-13, which was in effect in October 2025, and (ii) whether the General Assembly's later repeal of Code § 30-13 could be made retroactive.

majority's conclusion that the General Assembly did not strictly comply with Virginia's constitutional requirements. For this reason, I must respectfully dissent.

According to the majority, the General Assembly violated the intervening-election requirement in Article XII, Section 1 of the Virginia Constitution by passing a proposed constitutional amendment for the first time after early voters had begun casting their ballots during the 2025 general election. Although Article IV, Section 3 mandates that delegates shall be elected on the Tuesday succeeding the first Monday in November, the majority takes the position that there is a material variation between "shall be elected" and the "general election" described in Article XII Section 1. It reasons that, unlike the single day on which a delegate is elected, a general election is not a fixed day. Instead, they conclude that an election is a cumulative process, encompassing the combined actions of voters casting ballots and officers receiving those votes, that begins on the first day of early voting and ends on Election Day. By focusing on the legislative history, dictionary definitions, and how legal scholars might interpret the term "election," the majority fails to apply the most basic tenet of interpretation of constitutional provisions: looking to the language of the constitution itself.

> [T]he general rule is that unless the Constitution, either expressly or by necessary implication, inhibits the General Assembly from providing how a voter shall exercise his right to vote, its power is absolute. If there be no restraint, the General Assembly unquestionably has the power to determine the manner of conducting and making returns of elections. The framers of the Virginia Constitution, however, were not content to leave this question to be controlled by this general rule, but have specifically . . . expressly recognized and emphasized this power, and directed the General Assembly to exercise it.

*Moore v. Pullem*, 150 Va. 174, 192 (1928).

The express recognition of the General Assembly's power to determine the time and manner of conducting elections is found in Article II, Section 4 of the Virginia Constitution.

31

> The General Assembly shall provide for the nomination of candidates, shall regulate the time, place, manner, conduct, and administration of primary, general, and special elections, and shall have power to make any other law regulating elections not inconsistent with this Constitution.

*Id.*

The General Assembly, in turn, has exercised this power through Title 24.2 of the Code of Virginia. Under Code § 24.2-101, the General Assembly has specifically defined a "[g]eneral election" as "an election held in the Commonwealth *on* the Tuesday after the first Monday in November." (Emphasis added.) The use of the simple preposition "on" to form the prepositional phrase "on the Tuesday after the first Monday in November" definitively establishes that the General Assembly intended to exercise its Constitutional power and limit general elections to a single day. Had the General Assembly intended for general elections to cover multiple days, it would have used a complex preposition – such as "ending on" – to indicate that an election started at some earlier point in time rather than occurring solely on the Tuesday after the first Monday in November. However, "we regularly reject invitations to 'read into [a] statute language that is not there,' because of the long-established rule that '[c]ourts cannot add language to [a] statute the General Assembly has not seen fit to include.'" *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 163 (2021) (quoting *Wakole v. Barber*, 283 Va. 488, 495-96 (2012)). The General Assembly did not define a general election as an election *ending on* a specific day, it said that a general election is an election *held on* a specific day. *See Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007) ("When the language of a statute is unambiguous, we are bound by the plain meaning of that language.").

Moreover, it is highly informative that the General Assembly adopted a statutory definition of "general election" in 1970, while it was debating the 1971 amendments to the Virginia Constitution. *See* 1970 Acts ch. 462. Tellingly, the relevant portion of that definition is

identical to the present day definition of general election: "any election held in the Commonwealth on the Tuesday after the first Monday in November." *Id.* As this Court has long recognized, the "[l]egislative construction of a constitutional provision is entitled to consideration, and if the construction be contemporaneous with adoption of the constitutional provision, it is entitled to great weight. *Dean v. Paolicelli*, 194 Va. 219, 227 (1952). Taken as a whole, Code § 24.2-101 clearly establishes that the General Assembly, in the exercise of its constitutional power to determine the time and manner of conducting elections, chose to limit elections to a single day.

The majority dismisses this statutory definition on the basis that it is "[a] self-limiting statutory definition" that "cannot supersede the literal text, drafting history, historical context, and unambiguous purpose of a constitutional provision."[1] In reaching this conclusion, however, the majority misapprehends my argument. I am not stating that the General Assembly's definitions "take precedence over [the majority's] interpretation of Article XII, Section 1;" rather, I am simply stating that the General Assembly's definition informs the Court as to the intended construction of a relevant term in Article XII, Section 1.

Similarly, Code § 24.2-701.1(A) makes it clear that early in-person voting is not part of an election. Under the plain language of the statute, early voting begins "on the forty-fifth day *prior to any election* and shall continue until 5:00 p.m. on the Saturday immediately *preceding the election*." Code § 24.2-701.1(A) (emphasis added). Given that "prior" means "[p]receding in time or order," Black's Law Dictionary 1445 (12th ed. 2024), the most logical conclusion is

---

[1] The majority also notes the statute's preamble but offers no explanation for why "context requires a different meaning" of general election. Indeed, nothing about the context in which the term is used in Article XII, Section 1 would indicate that a different meaning is necessary.

that the General Assembly meant for early voting to begin and end *before* the actual election took place.

By contrast, applying the majority's definition of election to Code § 24.2-701.1(A), creates a causality paradox: an election is a process that begins with early voting, but early voting must precede an election by forty-five days. The majority's definition creates an infinite voting loop that appears to have no established beginning, only a definitive end: Election Day. Further, the majority also makes no mention of the two-day gap that begins at "5:00 p.m. on the Saturday immediately preceding the election," *id.*, or its effect on the "election" process. During this time, the "combined actions" that the majority claims define the term "election," cannot take place, as citizens are unable to cast votes during this time. Therefore, it is unclear how this period of time would be classified. Is the election held in abeyance? Does the election end and then restart? By limiting the term "election" to refer to a single day, as the framers of our Constitution and the General Assembly clearly intended, the infinite voting loop is avoided entirely, the two-day gap is of no consequence, and there is both a definitive beginning and end of an election: Election Day.

My analysis is further guided by this Court's admonishment that "all actions of the General Assembly are presumed to be constitutional," *Hess v. Snyder Hunt Corp.*, 240 Va. 49, 52 (1990), and, therefore, "a statute will be construed in such a manner as to avoid a constitutional question wherever this is possible." *Eaton v. Davis*, 176 Va. 330, 339 (1940). In my opinion, a narrow construction of Code § 24.2-101 is both reasonable and in perfect harmony with the entire Virginia Constitution. *See Va. Soc'y for Human Life v. Caldwell*, 256 Va. 151, 157 (1998) ("[W]e will narrowly construe a statute where such a construction is reasonable and avoids a constitutional infirmity."). The majority, however, not only disregards the General

Assembly's exercise of its express power to make laws that "regulate the time, place, manner, conduct, and administration" of elections under Article II, Section 4 of the Virginia Constitution, but it adopts a definition that is discordant with several other Constitutional provisions.

The cornerstone of constitutional interpretation is the presumption "that the same meaning attaches to a given word or phrase which is repeated in a Constitution." *Carlisle v. Hassan*, 199 Va. 771, 776 (1958). "The constitution must be viewed and construed as a whole, and every section, phrase and word given effect and harmonized if possible." *Id.* Thus, "[t]he presumption is that the same meaning attaches to a given word or phrase which is repeated in a Constitution, unless the contrary is made to appear, and hence the whole instrument should be examined to ascertain what that meaning is." *Pine v. Commonwealth*, 121 Va. 812, 825 (1917).

> Frequently the meaning of one provision of the Constitution, standing by itself, may be obscured or uncertain, but is readily apparent when resort is had to other provisions of the same instrument. It is, therefore, an established canon of constitutional construction that no one provision of the Constitution is to be separated from all the others and to be considered alone, but that all the provisions bearing upon a particular subject are to be brought into view and . . . interpreted as to effectuate the great purpose of the instrument.

*Pierce v. Dennis*, 205 Va. 478, 482 (1964) (internal quotation marks omitted).

When considering the majority's broad definition of election in light of other provisions of our Constitution, it is even more apparent that the term can only refer to an event occurring on a single day. For example, Article VII, Section 4 specifically provides that "[r]egular *elections* for [county and city] officers shall *be held on* Tuesday after the first Monday in November." (Emphasis added.) Notably, this provision does not state that county and city officers shall be *elected* on a specific day, as in Article IV, Sections 2 and 3; rather, it specifies that the *election*

35

shall be held on a single day.[2]  It is unclear how a provision specifically limiting an election to a single day can be harmonized with the majority's multi-day election scheme without fundamentally changing the plain language of Article VII, Section 4.

The disharmony does not stop there, as the majority's definition of election will result in at least 90 days[3] every year during which courts will be significantly hampered in their ability to hold trials.  Article II, Section 9 states:

> No voter, *during the time of holding any election at which he is entitled to vote*, shall be compelled to perform military service, except in time of war or public danger, nor to attend any court as suitor, juror, or witness; nor shall any such voter be subject to arrest under any civil process during his attendance at election or in going to or returning therefrom.

(Emphasis added.)

Applying the majority's definition means that, for the duration of every election, courts could not mandate that voters[4] attend trials in virtually any capacity, other than as a criminal defendant.  Indeed, every aspect of our district and circuit courts will be impacted, leading to numerous unforeseen consequences.  It is patently obvious that the framers of our Constitution did not intend for our courts to sit relatively idle for more than 25% of each year.  Again, the more harmonious construction is to simply limit elections to a single day, which avoids such wide-spread disruption.[5]

---

[2] As I explained above as part of my statutory analysis, the use of the simple preposition "on" definitively establishes the framers' intent to limit such elections to a single day.

[3] The 90-day total is based on the presumption that each general election is prefaced by a primary election, both of which allow for 45-days of early voting.  *See* Code § 24.2-701.1(A) (providing for in-person absentee voting beginning 45-days before "any election").  I feel it necessary to point out that this total could be expanded further in the event of a special election.

[4] The irony that juror lists are derived from the voter rolls is not lost upon me.

[5] Indeed, under the more commonly understood meaning of the term election, any disruption has been mitigated for the most part.  Notably, election day is a state holiday, therefore

Another problem with the majority's approach is that it injects unnecessary confusion into the qualifications for state senators and delegates.  Article IV, Section 4 provides:

> Any person may be elected to the Senate who, *at the time of the election*, is twenty-one years of age, is a resident of the senatorial district which he is seeking to represent, and is qualified to vote for members of the General Assembly.  Any person may be elected to the House of Delegates who, *at the time of the election*, is twenty-one years of age, is a resident of the house district which he is seeking to represent, and is qualified to vote for members of the General Assembly.

(Emphasis added.)

By extending the meaning of election to encompass a 45-day period, it raises the question:  when must a candidate be twenty-one years of age under Article IV, Section 4?  Obviously if a candidate turns twenty-one on or before the day early voting begins, they qualify.  But what if the candidate turns twenty-one on Election Day or sometime between the start of early voting and Election Day?  Must the candidate be twenty-one for a majority of the election period?  The answer is unclear.  In contrast, if the term "election" is given what I believe to be the most commonly understood definition, the meaning of Article IV, Section 4 is easily harmonized with the remainder of our Constitution: a candidate must be twenty-one years old on Election Day, which is when the election is held.

It is also worth noting that the majority's definition of "election" is derived, in part, from a line of cases explicitly holding that an election is limited to a single day.  In *Foster v. Love*, the United States Supreme Court recognized, as the majority points out, that an "election" refers to the "combined actions of voters and officials meant to make a final selection of an officeholder."

---

courts will be closed.  *See* Code § 2.2-3300 (designating "Election Day" as a legal holiday).  That leaves only a single day each year, the date of a primary election, with the possibility of a second in the event of a special election, in which voters could not be compelled to attend trials.

522 U.S. 67, 71 (1997).[6] Every federal circuit court that has applied the combined action approach has concluded that early voting is not considered part of the election. This is due to the fact that, during early voting, there is no combined action to make the final selection of an office holder. Indeed, only the voters are taking any action; it is only on election day that election officials are able to act. Thus, there can be no combined action until election day. *See Millsaps v. Thompson*, 259 F.3d 535, 547 (6th Cir. 2001), ("An 'election' under the federal statutes requires more than just voting, and the Early Voting Statutes do not create a regime of combined action meant to make a final selection on any day other than federal election day.")[7]; *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001) ("The *Foster* definition of 'election' implies that there is only a single election day . . . when the election is 'consummated,' even though there are prior voting days."); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000) ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day.").

---

[6] The majority omits the very next sentence stating that "[b]y establishing a particular day as 'the day' on which these actions must take place, the statutes simply regulate the time of the election, a matter on which *the Constitution explicitly gives Congress the final say*." Foster, 522 U.S. at 71-72 (emphasis added). Just as the United States Constitution gives Congress the final say on when the combined actions of voters and officials take place in federal elections, so too does the Virginia Constitution give the General Assembly the final say on when the combined actions of voters and officials take place in state elections. *See* Article II, Section 4 of the Virginia Constitution. Furthermore, as previously noted, the General Assembly has exercised its authority and declared that that general elections will take place on a single day. *See* Code § 24.2-101.

[7] "The Early Voting Statutes" at issue in *Millsaps* were similar to Virginia's in that they allowed voters to cast their votes "not more than twenty (20) days nor less than five (5) days before the day of the election." 259 F.3d 535, 537 (6th Cir. 2001) (quoting Tenn. Code Ann. § 2-6-102(a)(1)) (emphasis omitted).

By including early voting into its definition of election, the majority goes beyond the combined action theory of *Foster*. In doing so, it appears that the majority's definition of election would run afoul of federal election law.[8]

> The Elections Clause of the Constitution, Art. I, § 4, cl. 1, provides that "the Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." The Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices. Thus it is well settled that the Elections Clause grants Congress the power to override state regulations by establishing uniform rules for federal elections, binding on the States. The regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.

*Foster*, 522 U.S. at 69 (internal citations and quotation marks omitted).

The United States Supreme Court explicitly recognized that 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 "mandate[] holding all elections for Congress and the Presidency *on a single day throughout the Union*." *Id.* at 70 (emphasis added). Although states "are given . . . a wide discretion in the formulation of a system for the choice by the people of representatives in Congress," *United States v. Classic*, 313 U.S. 299, 311 (1941), that discretion ends when it conflicts with federal election laws. *See Bomer*, 199 F.3d at 775. By extending elections in the Commonwealth of Virginia beyond a single day, the majority's formulation would directly conflict with the federal mandate that elections for federal offices be held on a single day.

---

[8] I recognize that the specific election at issue in this case was the general election of members of the House of Delegates. However, the decision we hand down today will apply equally to elections for federal offices.

It is further telling that no other state has adopted a multi-day election scheme that the majority claims Virginia has apparently been operating under for decades. Nor has any participant in this case pointed to statutes or case law conclusively stating that any state has adopted a similar approach where elections begin with early voting and end on election day. Instead, Appellees rely on cases like *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194 (4th Cir. 2024), and *New Georgia Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020), as supporting their assertion that elections begin when early voting begins. In my opinion, any reliance on *Pierce*, *Raffensperger*, or their ilk is misplaced.

In *Pierce*, a majority of the Fourth Circuit observed:

> The 2024 North Carolina Senate election is well underway. The statewide primary election is scheduled for March 5, 2024. Candidate filing ended on December 15, 2023. Absentee ballots were distributed on January 19, 2024. In-person early voting began on February 15, 2024. The election is not merely "close[]," or even "imminen[t]"—it is happening right now.

*Id.* at 226-27 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)).[9]

In footnote 11 of *Pierce*, the Fourth Circuit specifically observed that, by the time its opinion was publicly released, "the March 5 primary is over and done" and "[t]he boards of elections have certified final results." 97 F.4th at 226, n.11. This observation clearly established that the election was objectively *not* actually happening "now;" rather, it had already occurred.

Moreover, the Fourth Circuit explained that its analysis was governed by "'the *Purcell* principle.'" *Id.* at 225 (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J. concurring)). Under the *Purcell* principle, "federal courts ordinarily should not enjoin a state's

_____

[9] This quote from *Pierce* leaves open a significant question: When did the election actually begin? Was it after candidate filing ended, when the absentee ballots were distributed, or when the early voting began?

election laws in the period close to an election." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J. concurring) (citing *Purcell*, 549 US at 1). When the "happening right now" statement is viewed in conjunction with the *Purcell* principle, it is readily apparent that the statement was not meant to be taken literally. It was, at most, a rhetorical flourish meant to drive home the point that the plaintiff's challenge to the electoral maps was simply too late.[10]

The Eleventh Circuit's observation in *Raffensperger* is similarly misleading. In *Raffensperger*, the district court enjoined a Georgia law requiring that absentee ballots be received by 7:00 a.m. on election day. *Id.* at 1280. The Eleventh Circuit reversed, observing "we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed." *Id.* at 1283. Yet, as with *Pierce*, nothing in *Raffensperger* demonstrates that an election was actually ongoing at that time; rather this statement was made as part of the Eleventh Circuit's application of *Purcell*.[11] In other words, it was simply hyperbole meant to demonstrate the impropriety of the district court's injunction at such a late juncture.

For these reasons, I cannot join the majority's decision to affirm the circuit court's determination that the November 4, 2025 election was not "the next general election of members of the House of Delegates." Instead, I would hold that an election occurs on a single day – election day – and reverse the decision of the circuit court. Further, as I believe that the circuit

---

[10] It is further worth noting that, as *Pierce* was a redistricting case, the dispositive issues are markedly different from the present case. The validity of electoral maps must be established prospectively, as the operative maps must be in place well before candidate filing deadlines and then they cannot be changed until after the general election. In contrast, as the present case demonstrates, a determination of whether voting takes place on a single day or over a span of many days can be performed retroactively.

[11] Indeed, the Eleventh Circuit's rationale seems to further extend the definition of "election" to include the mere distribution of absentee ballots.

court's decision regarding the next general election was erroneous, it is necessary that I briefly address the remaining bases of the circuit court's decision.

With regard to the circuit court's conclusion that HJR 6007 was void ab initio because it violated HJR 428 and HJR 6001, I would similarly reverse the decision of the circuit court. As this Court has repeatedly recognized, Virginia has a "steadfast and explicit commitment to the concept of the separation of powers." *Appian Corp. v. Pegasystems, Inc.*, 305 Va. ___, 924 S.E.2d 621, 639 (2026). The principle is fully ensconced not once, but twice in the current version of the Virginia Constitution. *See* Article I, Section 5 ("the legislative, executive, and judicial departments of the Commonwealth should be separate and distinct") and Article III, Section 1 ("[t]he legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others, nor any person exercise the power of more than one of them at the same time"). Indeed, every previous version of our Constitution has enshrined this foundational concept. *See* Va. Decl. of Rights § 5 (1776); Va. Const. art. I, § 5 & art. II (1830); Va. Const. art. I, § 5 & art. II (1851); Va. Const. art. I, § 5 & art. II (1864); Va. Const. art. I, § 7 & art. II (1870); Va. Const. art. I, § 5 & art. III, § 39 (1902). Moreover, Article IV, § 7 of the Virginia Constitution explicitly gives the Senate and the House each the authority to "settle its rules of procedure." It is in consideration of these principles that this Court has explicitly held that, "[w]hile the courts can pass upon the constitutionality of legislative enactments, they cannot overthrow legislative determination of the existence of conditions with respect to its own procedure, or the existence of conditions satisfying it of the propriety of its action." *Albermarle Oil & Gas Co. v. Morris*, 138 Va. 1, 11 (1924).

Here, the circuit court's ruling was based squarely on its determination that the General Assembly violated its own procedural resolutions. As compliance with internal legislative

procedures is a matter committed squarely to the General Assembly, it was not subject to judicial review. Thus, the circuit court clearly intruded upon the realm of legislative procedure, in direct violation of the principle of separation of powers.

Moreover, even assuming that the constitutional implications of HJR 6007 provided an exception to the principle of separation of powers, the result would be the same. The record clearly establishes that the circuit court reached its conclusion due to an apparent misinterpretation of HJR 6001. In April 2023, the General Assembly, through HJR 428, requested that then-Governor Youngkin call a special session. In addition to requesting the special session, HJR 428 specifically provided that:

> after the Special Session is convened for the first time, it may stand in recess from time to time until reconvened by the joint call of the Speaker of the House of Delegates and Chair of the Senate Committee on Rules to consider *such matters as are provided for in the procedural resolution adopted to govern the conduct of business coming before such Special Session*[.]

(Emphasis added.)

Upon convening the special session, the General Assembly passed the required procedural resolution, HJR 6001, which stated, in relevant part:

> except with unanimous consent of the house in which the legislation is offered, no bill, joint resolution, or resolution shall be offered or considered in either house during the Special Session other than (i) Budget Bill(s) and revenue bills; (ii) single-house commending and memorial resolutions; (iii) *bills, joint resolutions, or resolutions affecting the rules of procedure or schedule of business of the General Assembly, either of its houses, or any of its committees*; (iv) the election of judges and other officials subject to the election of the General Assembly; or (v) appointments subject to the confirmation of the General Assembly[.]

(Emphasis added.)

By its plain language, HJR 6001 expressly exempted "bills, joint resolutions, or resolutions affecting the rules of procedure or schedule of business of the General Assembly,

43

either of its houses, or any of its committees" from the unanimity requirement.[12]  Thus, any

subsequent procedural resolutions, such as HJR 6004 or HJR 6006, would not, as the circuit

court found, require unanimous consent.  As the circuit court's ruling was based entirely on a

requirement of unanimity that explicitly did not apply to procedural resolutions, it was plainly

wrong.  Accordingly, I would reverse the circuit court's determination that HJR 6007 was void

ab initio.[13]

I would further reverse the circuit court's decision that the failure to comply with Code

§ 30-13 invalidates the initial passage of the proposed amendment.  Code § 30-13 states, in

relevant part:

> The Clerk of the House of Delegates shall have published all
> proposed amendments to the Constitution for distribution from his
> office and to the clerk of the circuit court of each county and city
> two copies of the proposed amendments, one of which shall be
> posted at the front door of the courthouse and the other shall be
> made available for public inspection.  Every clerk of the circuit
> court shall complete the posting required not later than three
> months prior to the next ensuing general election of members of

---

[12] In discussing HJR 6001, the circuit court appears to have omitted much of subsection (iii).  As a result, the language indicating that procedural resolutions were exempt from the unanimity requirement was absent from the circuit court's ruling.

[13] Although Appellees attempt to challenge the validity of HJR 6007 by claiming that the 2024 Special Session could not be reconvened after the 2025 General Session began, it is unnecessary to address that issue at this time.  Notably, the circuit court ruled against Appellees on that issue, concluding that the 2024 Special Session "was valid up to and including the October 31, 2025 meeting of said Special Session."  Appellees never challenged the circuit court's ruling by assigning cross-error.  *See* Rule 5:18(c)(1) (requiring an assignment of cross-error before the issue will be noticed by the Court).  Although the Court has recognized that "[n]o cross-appeal is necessary when an appellee seeks to support a judgment on alternative legal grounds, including those expressly rejected by the trial court and those raised for the first time on appeal," that exception does not apply when "an appellee seeks to modify or otherwise change a favorable judgment 'with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" *Alexandria Redevelopment & Hous. Auth. v. Walker*, 290 Va. 150, 156 (2015) (quoting *Jennings v. Stephens*, 574 U.S. 271, 276 (2015)).  Here, a ruling in favor of Appellees has the potential to expand the rights of the minority party of the General Assembly and lessen the rights of the majority party.  Accordingly, the exception to Rule 5:18(c)(1) does not apply and this issue is not properly before the Court at this time.

the House of Delegates and shall certify such posting to the Clerk of the House of Delegates.

The circuit court explained that the "sole purpose for the posting" requirement found in Code § 30-13 "is to provide the voters with notice and information PRIOR to the election of the House of Delegates members who would be elected to vote on the proposed Constitutional Amendment for the second vote." According to the circuit court, the posting requirement is a part of the General Assembly's "duty" under Article XII, Section 1 of the Virginia Constitution to submit proposed amendments to the voters by prescribing "how the vote can take place, and what steps must be taken prior to such vote." This was error.

First, the only duty imposed by Article XII, Section 1 arises *after* the second passage of the proposed amendment in the General Assembly, not before. Once "a majority of all the members elected to each house" agrees to the proposed constitutional amendment a second time, "*then* it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the voters qualified to vote in elections by the people, in such manner as it shall prescribe." *Id.* (emphasis added). By interpreting Code § 30-13 in a manner that prematurely imposed that duty upon the General Assembly, the circuit court placed the cart before the horse.[14]

Second, even if it could be considered part of the manner prescribed by the General Assembly for submitting a proposed amendment to the voters, posting the proposed amendment

---

[14] Prior to 1971, the Constitution featured a publication requirement like the one in Code § 30-13. *See* Va. Const. art. XV, § 196 (1902) (providing that a proposed amendment "shall be published for three months previous to" the intervening House of Delegates election). The General Assembly removed the publication requirement while drafting what became the 1971 Constitution. *See* Proceedings and Debates of the House of Delegates Pertaining to Amendment of the Constitution 496 (1969); 2 A.E. Dick Howard, Commentaries on the Constitution of Virginia 1171, 1175 (1974). This history bolsters the conclusion that publication of a proposed constitutional amendment is not a necessary condition for an amendment to be valid.

ninety days prior to the intervening election is not essential to the subsequent ratification of that amendment. As this Court has recognized, the actions of a third-party that do not directly impact the ratification of an amendment are not essential to the process; rather, "[i]t is the ascertained majority of the vote of the electors which gives effect to [an] amendment." *Harrison v. Day*, 201 Va. 386, 394 (1959). At its core, the statutory requirements of Code § 30-13 involve third-party bystanders to the constitutional amendment process – circuit court clerks – performing a peripheral act – posting the text of the amendment – that relates to, but does not directly impact, the ratification of a constitutional amendment. Simply put, Code § 30-13 is of no Constitutional dimension. Accordingly, the failure to follow the posting requirements of Code § 30-13 is insufficient to invalidate the ratification of an amendment that otherwise meets the requirements of Article XII, Section 1.

For the foregoing reasons, I would reverse the decision of the circuit court and enter final judgment in favor of the appellants.